# EXHIBIT 7

# United States District Court
# Central District Of California

GINA BALASANYAN, an individual, and
NUNE NALBANDIAN, an Individual on
behalf of themselves an all others similarly
situated,

                Plaintiffs,

      vs.

NORDSTROM, INC., a Washington
corporation; DOES 1-100, inclusive,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:    CV-11-05689-DDD- (JCGx)

# CERTIFIED COPY

## DEPOSITION OF
## MATTHEW BODAKEN

Location:           6310 San Vicente Boulevard, Suite 360
                    Los Angeles, California 90048

Date:              Friday, November 18, 2011 2:05 p.m.

Reporter:          Willie Anderson, Jr.,
                    Certificate Number    13385

HinesReporters.Com,Inc.

International Tower
888 S. Figueroa Street, Suite 840, Los Angeles, CA 90017
Main No. (866) 452-4500, Fax (213) 688-9656

www.hinesreporters.com

**Exhibit 7**

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   GINA BALASANYAN, an      )
     individual, and NUNE     )
 6   NALBANDIAN, an           )
     Individual on            )
 7   behalf of themselves     )
     and all others           )
 8   similarly situated,      )
                              )
 9        Plaintiffs,         )
                              )
10        vs.                 ) Case No. CV-11-05689-DDD-(JCGx)
                              )
11   NORDSTROM, INC., a       )
     Washington corporation; )
12   DOES 1-100, inclusive,  )
                              )
13        Defendants.         )
     _____ )

14

15

16

17

18

19                  DEPOSITION OF
                    MATTHEW BODAKEN
20

21             Friday, November 18, 2011

22                   2:05 p.m.

23             6310 San Vicente Boulevard
               SUITE 360
24             Los Angeles, California

25
```

Gina Balasanyan vs. Nordstrom, Inc.                                Deposition of Matthew Bodaken

| | |
|---|---|
| 1 Deposition of MATTHEW BODAKEN, called as a witness by | 1       MATTHEW BODAKEN, |
| 2 the Plaintiffs, before WILLIE ANDERSON, JR., Certified | 2 called as a witness by and on behalf of the Plaintiffs, |
| 3 Shorthand Reporter Number 13385, for the State of | 3 having been first duly sworn, was examined and |
| 4 California, with principal office in the County of Los | 4 testified as follows: |
| 5 Angeles, commencing at 2:05 p.m., Friday, November 18, | 5 |
| 6 2011, at 6310 San Vicente Boulevard, Los Angeles, | 6       EXAMINATION |
| 7 California. | 7 BY MS. SHAMTOUB: |
| 8          * * * | 8    Q.  Good afternoon. |
| 9 APPEARANCES: | 9    A.  Hello. |
| 10 | 10    Q.  Can you please state your full name for the |
| 11    FOR THE PLAINTIFFS GINA BALASANYAN AND NUNE | 11 record. |
| NALBANDIAN: | 12    A.  Matthew Bodaken. |
| 12    SCHWARCZ, RIMBERG, BOYD & RADER, LLP | 13    Q.  And Mr. Bodaken, can you please provide your |
| 13    BY:  SHERLI SHAMTOUB, ESQ. | 14 address and telephone number of the Nordstrom store |
|    6310 San Vicente Boulevard | 15 that you work at. |
| 14    Suite 360 | 16    A.  Sure.  My home address is 1132 Beach Street, |
|    Los Angeles, California 90048 | 17 and that's in South Pasadena, and the phone number at |
| 15    (323) 302-9488 x 209 | 18 Nordstrom is (818) 502-9922. |
|    sshamtoub@srbr-law.com | 19    Q.  And Mr. Bodaken, have you testified in a |
| 16 | 20 deposition before? |
| 17 FOR THE DEFENDANTS NORDSTROM, INC.: | 21    A.  I have not, no. |
| 18    LAW OFFICES OF LITTLER, MENDELSON | 22    Q.  Okay.  So before we begin with the question- |
|    BY:  LARA K. STRAUSS, ESQ. | 23 and-answer series, which is essentially what the |
| 19    501 West Broadway | 24 deposition is about, I'm going to go through the |
|    Suite 900 | 25 admonitions. |
| 20    San Diego, California 92101-3577 | |
|    (619) 232-0441 | |
| 21 ALSO PRESENT: | |
| 22    Sonseraye Anderson | |
| 23 APPEARING TELEPHONICALLY: | |
| 24    ROSA FRUEHLING-WATSON, ESQ. | |
| 25 | |
|                                              Page 2 |                                              Page 4 |

| | |
|---|---|
| 1           I N D E X | 1       Basically, it sets forth the groundwork for |
| 2 Examination                    Page | 2 what takes place in the deposition, and there's certain |
| 3 By Ms. Shamtoub                    4 | 3 questions involved in that as well; okay? |
| 4 | 4    A.  Okay. |
| 5       PLAINTIFFS' EXHIBITS | 5    Q.  First off, I'd like to remind you that you are |
| 6 1 - A Document With "Nordstrom" At The Top  47 | 6 under oath.  So anything you say here today carries the |
|    And Columns With "September" And "Date" | 7 same force and effect as if you were in a courtroom. |
| 7    In The Top Left-hand Corner, 5 Pages | 8       Do you understand that? |
| 8 | 9    A.  I do. |
| 9 | 10    Q.  Please answer all the questions to the best of |
| 10 QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER | 11 your ability.  So that means no guessing.  I am |
| 11       Page       Line | 12 entitled to ask you follow-up questions. |
| 12       (None.) | 13       And if I ask you a question and your memory is |
| 13 | 14 somehow jogged, then I'm entitled to any -- any |
| 14 | 15 response that you have -- |
| 15    INFORMATION REQUESTED | 16    A.  Okay. |
| 16       Page       Line | 17    Q.  -- from that point; okay? |
| 17       (None.) | 18    A.  Sure. |
| 18 | 19    Q.  Also, please remember that -- don't answer |
| 19 | 20 anything with hand or head gestures. |
| 20 | 21    A.  Okay. |
| 21 | 22    Q.  Provide verbal responses.  I mean you can, |
| 22 | 23 certainly, shake your head and provide hand gestures, |
| 23 | 24 but it's quite difficult for the court reporter to |
| 24 | 25 write that down, to get that all down. |
| 25 | |
|                                              Page 3 |                                              Page 5 |

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Matthew Bodaken

1   A.  I understand.
2   Q.  So please, follow-up with a verbal response;
3   okay?
4   A.  Yes.
5   Q.  And I'll do the same.  I tend to do hand
6   gestures quite a bit.  So I'll refrain as well.  So it
7   goes both ways.
8       If you don't remember some things, please,
9   just simply state that you don't remember.
10  A.  Okay.
11  Q.  Again, we don't want you to guess.  We want
12  your testimony to be to the best of your recollection.
13  A.  Okay.
14  Q.  I may ask you to provide me with some
15  estimates.
16      And do you know the difference between an
17  estimate and a guess?
18  A.  Yes.  I believe I do.
19  Q.  Just to clarify, an estimate, essentially,
20  would be if I asked you to give me the length and width
21  of this table in front of you, you can give me that
22  because you're looking at it.
23      If I were to ask you to give me the length and
24  width of the table in the conference room adjacent from
25  your office, you wouldn't be able to do so because you

Page 6

1   sort of immediate attention.
2       So it -- we would write it up at that point or
3   sometime near the point of occurrence to have a
4   discussion with human resources to try to make sure the
5   behavior is -- or actions are following with what we
6   would consider normal Nordstrom business.
7   Q.  And how many opportunity checks did you
8   recall --
9   A.  As I recall --
10  Q.  -- where --
11  A.  -- excuse me.  There were three during the
12  course of the time that I looked at, during the course
13  of the time that Nune's been working here.
14  Q.  And what is this course of time?  How long has
15  Nune been working?
16  A.  Nune started in 2004, I believe, and is still
17  employed.  So until now, 2011, still, currently,
18  employed.  So from 2004 until currently.
19  Q.  I got a bit sidetracked.  So let's just get
20  back to another point that I wanted to make to you
21  that, during the course of this deposition, the court
22  reporter will be recording everything that we're
23  saying.
24      Following the conclusion of the deposition,
25  you'll receive a transcript -- and we'll go into

Page 8

1   haven't seen that table.
2       Do you understand?
3   A.  I do.
4   Q.  Okay.  And as a courtesy to the court
5   reporter, please refrain from answering any question
6   until I, actually, finish my question; okay?
7   A.  Okay.
8   Q.  And have you taken any medications today that
9   might impair your ability to testify?
10  A.  No, I have not.
11  Q.  Have you spoken to anyone today aside from
12  Nordstrom's attorney concerning this deposition?
13  A.  No.
14  Q.  And have you reviewed any documents prior to
15  this deposition?
16  A.  I have.
17  Q.  Okay.  What documents have you reviewed?
18  A.  I went back through the annual performance
19  reviews and opportunity checks that I've had with Nune.
20  Q.  What are opportunity checks?
21  A.  Opportunity checks are when incidents occur
22  during the course of a year that require a discussion
23  with our human resources department.  And it's not --
24  we would not want to save that for annual performance
25  review.  It's something that needs immediate -- some

Page 7

1   further detail about this at the end of the
2   deposition -- but at that point, you'll have an
3   opportunity to review the transcript and make any
4   correction to your responses; okay?
5   A.  Okay.  I understand.
6   Q.  Keep in mind that any response -- any
7   corrections that you make can then be commented on at a
8   later point throughout this litigation.
9   A.  I understand.
10  Q.  So keeping that in mind, it's quite important
11  then, to provide the best responses that you can
12  provide.  Otherwise, it could, potentially, affect your
13  credibility.
14  A.  I will try.
15  Q.  Mr. Bodaken, can you please state the title of
16  your current position?
17  A.  I am the sales -- retail sales manager for the
18  men's clothing department at the Glendale store.
19  Q.  And Mr. Bodaken, how long have you held this
20  position?
21  A.  I've been in this particular position since
22  July of 2002.
23  Q.  Now, the purpose of this deposition is,
24  essentially, about Nordstrom's Dispute Resolution
25  Program.

Page 9

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Matthew Bodaken

| | |
|---|---|
| 1   A.   Okay. | 1     Dispute Resolution Program?") |
| 2   Q.   Were you aware that Nordstrom rolled out a new | 2     MS. STRAUSS:   Thank you.   Sorry. |
| 3   Dispute Resolution Program in June 2011? | 3     You can go ahead. |
| 4   A.   Yes. | 4     THE WITNESS:   In the manager's meeting, I |
| 5   Q.   And how were you informed of the 2011 | 5   believe, it would have been, probably, maybe five |
| 6   roll-out? | 6   minutes, not much -- not much more than that. |
| 7   A.   The initial -- | 7     Maybe up to ten, only in that it was discussed |
| 8     MS. STRAUSS:   June 2011? | 8   briefly, and then we all needed to sign it and turn it |
| 9     MS. SHAMTOUB:   Yes.  I'm sorry. | 9   in before the end of the meeting. |
| 10  BY MS. SHAMTOUB: | 10  BY MS. SHAMTOUB: |
| 11   Q.   The June 2011 roll-out. | 11   Q.   What did you need to sign? |
| 12   A.   The initial source of information for me was a | 12   A.   Just an acknowledgement that we had received |
| 13  mailer that I received from our -- I believe from our | 13  that information. |
| 14  corporate offices. | 14   Q.   That you had received the training or that you |
| 15   Q.   Did you receive any information about the | 15  had received the Dispute Resolution Program? |
| 16  June 2011 roll-out from Nordstrom's HR department? | 16   A.   Received the sheet that listed the information |
| 17   A.   From the store information -- human -- excuse | 17  on there just -- so I guess it would be the program. |
| 18  me -- store human relations department?  No.  That was | 18  It's at least our -- my understanding of the program, |
| 19  just a mailer from the corporate offices. | 19  yes. |
| 20   Q.   Were you asked to provide an Acknowledgement | 20   Q.   Were there any employees present at this |
| 21  of Receipt for the June 2011 roll-out? | 21  meeting? |
| 22   A.   Not that I recall. | 22   A.   Just other department managers or assistant |
| 23   Q.   Are you aware if Nordstrom rolled out another | 23  managers. |
| 24  Dispute Resolution Program or another set of changes to | 24   Q.   I'm sorry.  By "employees," I meant |
| 25  the Dispute Resolution Program sometime in August 2011? | 25  nonmanagerial employees. |
| Page 10 | Page 12 |
| 1   A.   Yes.  That was -- I believe it was the last | 1   A.   None that I recall, no. |
| 2   week of August because it's right before I was going on | 2   Q.   And do you recall if you received any |
| 3   vacation.  I remember that. | 3   documents reflecting the specific changes made to the |
| 4   Q.   I love vacations. | 4   Dispute Resolution Program by way of the August 2011 |
| 5     Don't we all? | 5   update? |
| 6   A.   We all look forward to it.  Yeah, absolutely. | 6   A.   No. |
| 7   Q.   Now, when were you first informed of the | 7     MS. STRAUSS:   Objection.  Vague. |
| 8   August 2011 Dispute Resolution Program? | 8     You mean as opposed to the Dispute Resolution |
| 9   A.   In a manager's meeting.  It would have been on | 9   Program? |
| 10  a Monday.  That last Monday of August. | 10    MS. SHAMTOUB:   Yes. |
| 11   Q.   Was this meeting specific to the roll-out of | 11    MS. STRAUSS:   Okay.  You can go ahead and |
| 12  the Dispute Resolution Program? | 12  answer. |
| 13   A.   No.  It was our general manager's meeting with | 13    THE WITNESS:   No.  I don't recall any |
| 14  our store manager where it was a variety of topics. | 14  difference. |
| 15  That was one of the topics our human resource manager | 15  BY MS. SHAMTOUB: |
| 16  discussed, but it's -- was a -- it was a small percent | 16   Q.   And what were you instructed was your role as |
| 17  of the time spent in that manager's meeting. | 17  to the roll-out of the 2011 Dispute Resolution Program? |
| 18   Q.   How much time do you think was spent on the | 18   A.   To take the sheets -- they gave us one for |
| 19  roll-out of the June 2011 Dispute Resolution Program? | 19  each of my crew -- members of my crew -- and to ask |
| 20    MS. STRAUSS:   I'm sorry.  Objection.  Can you | 20  them to read it and then to sign it and return it to |
| 21  repeat the question. | 21  our human resources department. |
| 22    (The record was read by the Court | 22   Q.   So was one of your roles to make sure |
| 23    Reporter as follows: | 23  everybody in your department signed the Acknowledgement |
| 24    "Q.   How much time do you think was | 24  of Receipt of the Dispute Resolution Program? |
| 25    spent on the roll-out of the June 2011 | 25   A.   Yes. |
| Page 11 | Page 13 |

**Hines Reporters**

Exhibit 7     4

Gina Balasanyan vs. Nordstrom, Inc.                                   Deposition of Matthew Bodaken

1  Q.  And once an employee in your department signed
2  the Acknowledgement, were you then required to turn
3  that -- I'm sorry.
4       Once the employee in your department signed
5  the Acknowledgement, were they required to turn that
6  over to you?
7  A.  If -- if I was working with them, yes, I asked
8  them to give it, and I would turn it back into human
9  resources for them, yes.
10  Q.  And how many employees do you have in your
11  department?
12  A.  Four people that I supervise.
13  Q.  And when did you -- how long after the
14  meeting, the manager meeting that you had, when you
15  first learned of the August 2011 Dispute Resolution
16  Program change, did you then turn -- submit those
17  documents over to the employees in your department?
18  A.  Depended on when those employees were working.
19  So if -- if they were off some of the time, it was
20  gonna -- I was gonna have to hold it until the next
21  time they would be in the store, in the department
22  working.
23  Q.  So you tried to get it to them the first time,
24  but they came back after you first learned of the
25  program?

Page 14

1  A.  Yes.  Yes.
2  Q.  And how long did it take for them to return
3  the signed Acknowledgement to you?
4  A.  I -- I had one person -- I had two people -- I
5  had one person out on vacation.  Nune was on a medical
6  leave at the time, and two other individuals, the days
7  they worked, they both signed it and turned it back in.
8  Q.  Prior to getting the signed Acknowledgement
9  back from your employees, did HR follow up with you
10  regarding retrieval of the signed Acknowledgement?
11  A.  I, actually, notified them the fact that I had
12  two people that were not gonna be working during the
13  course of that week, and that was the week before,
14  again, I was leaving to go on vacation.
15       So we had a discourse just to let them know
16  that I could either take care of it upon my return or
17  if they needed it to get taken care of, I would refer
18  the employees to contact human resource.
19       And that's what we asked -- they asked me to
20  do was to refer them up to human resources while I was
21  gone.
22  Q.  And how long were you gone?
23  A.  I was gone for about, If I recall, right about
24  11 days, and it started the following Saturday after
25  that manager's meeting.

Page 15

1  Q.  Did you return -- so mid-September were you
2  back?
3  A.  I got back to work on, I believe, it was
4  September 13th.  It would have been that -- the -- the
5  week after Labor Day, the Monday after Labor Day.  It
6  was either that Monday or that Tuesdays, If I recall.
7  Q.  And upon your return from your vacation time,
8  did HR contact you regarding the outstanding
9  Acknowledgement?
10  A.  Yes.  Yes.
11  Q.  And what did they say to you?
12  A.  We still had to work on -- because Nune was
13  still on a medical leave, so she hadn't yet returned.
14  So we still had to work to try to make sure that she
15  got hers signed and then turned back in.
16  Q.  Was anybody else outstanding?
17  A.  I had -- the one person that was on vacation
18  had taken care of it during the course of my vacation,
19  and so it was just Nune's left to do, that I recall.
20  Q.  And what do you mean by "work on"?
21  A.  If -- If I recall -- I'm trying to -- "work
22  on," I guess, refers to either -- because Nune and my
23  schedule were opposite during the course of that week
24  when I returned, so she was gonna be working on two or
25  three days that I would not be present.  And then I was

Page 16

1  working days when she would not be present.
2       So it was -- the discourse that I would have
3  had with her would have been through a note which
4  would -- or some sort of information.
5       I might have left in as -- we could do as part
6  of your personal -- we could put a note in on our
7  computer where there's a to-do list that's generated.
8       So that -- when I say "work on," it's how I
9  would try to contact her since she and I were not
10  working together.
11  Q.  And what was the resolution that you came to
12  with HR?
13  A.  HR was gonna attempt to get it taken care of
14  since they would see her and ask her to -- before I
15  would.
16       By that time, we were, roughly, three to --
17  nearly three weeks past when it was given to the rest
18  of the store.  So we were trying to get that, I think,
19  all taken care of.
20  Q.  So when was this conversation?  When you had
21  this conversation with HR, was this prior to
22  Ms. Nalbandian returning from her leave or after?
23  A.  Yes.  It would have been upon my return back
24  from vacation.  It would have been during the course of
25  that week, probably, a day or two before she came back

Page 17

Gina Balasanyan vs. Nordstrom, Inc.                    **Deposition of Matthew Bodaken**

1  from her leave.
2     Q.  Now, during the meeting, when you first
3  learned of the August 2011 Dispute Resolution
4  Program -- let's just call it the August meeting.
5     A.  Okay.
6     Q.  Were you instructed what to do if somebody did
7  not sign the Acknowledgement form?
8     A.  Not that I recall.  There weren't -- it wasn't
9  anything specific.  It was just -- it was just ask
10  for -- to get a signature, and that's pretty much the
11  extent of the instruction that I remember being given.
12     Q.  Were you aware of any impact on the employee
13  if they didn't sign the Acknowledgement?
14     A.  No.
15        MS. STRAUSS:  Objection.  Vague.
16        THE WITNESS:  Sorry.  I'm sorry.  No.  Not
17  that I'm -- I wasn't -- yeah.  That's not something
18  that was discussed or mentioned.
19  BY MS. SHAMTOUB:
20     Q.  Do you know if any employees were written up
21  for signing to -- for refusing to sign the
22  Acknowledgement?
23     A.  I would only know about my department, and I
24  did not broach that, and no one in my department was.
25     Q.  Were you instructed what to do if one of the
                                                    Page 18

1  employees in your department requested an opportunity
2  to review the Dispute Resolution Program prior to
3  signing the Acknowledgement form?
4     A.  That would -- that would have been fine.  I
5  mean, I allowed at the time -- I think 'cause I had --
6  when Nune and I, finally, worked together that
7  following week, my understanding from talking to her is
8  that she had not yet turned it back into human
9  resources.
10        And so I said, "Well, you know, if you need to
11  get someone to make it clearer or want to be clear on
12  it, you can."  We just wanted to get that -- it was
13  just some paperwork that needed to get resolved.
14     Q.  So did you then end up handing Nune the
15  Dispute Resolution Program?
16     A.  I had left a copy in her -- she had a personal
17  box there.  So she had one available.  I did not give
18  it to her.  She had one already 'cause I left it there
19  for her.
20     Q.  During the August 2011 meeting, were you
21  instructed regarding the effect of the Dispute
22  Resolution Program on individuals who are involved in
23  litigation?
24     A.  No.  We didn't discuss anything of that sort,
25  no.
                                                    Page 19

1     Q.  This is in line with the question -- the other
2  question as well.
3        Were you instructed what to say to any
4  individuals -- any employees who were involved in
5  litigation about the Dispute Resolution Program?
6     A.  No.
7     Q.  Were you given general talking points of what
8  to say to employees as you were handing out the Dispute
9  Resolution Program?
10     A.  Essentially, what she went over in that
11  manager's meeting was just to notify the employees that
12  it was new information, and it was something that they
13  could read over, and it was just to sign as
14  acknowledgement that they had received that
15  information.  And that was the extent of it.
16     Q.  Did you tell the employees in your department
17  that signing the Acknowledgement only had the effect of
18  showing receipt of the Dispute Resolution Program?
19     A.  Yes.
20     Q.  Did any of the employees ask you whether
21  signing for it had any other impact?
22     A.  No.
23     Q.  Did you communicate to them that signing the
24  Acknowledgement didn't mean that they were signing an
25  agreement?
                                                    Page 20

1        MS. STRAUSS:  Can you read that back.
2        (The record was read by the Court
3        Reporter as follows:
4        "Q.  Did you communicate to them that
5        signing the Acknowledgement didn't mean
6        that they were signing an agreement?")
7        THE WITNESS:  As far as I understood it, yes.
8  Yes.
9  BY MS. SHAMTOUB:
10     Q.  As far as you understood it -- I'm sorry.  I
11  don't quite understand what yes means.
12        What are you saying yes to?
13     A.  Well, I guess I'm not 100 percent clear on the
14  question, but...
15     Q.  I can clarify the question --
16     A.  Sure.
17     Q.  -- because I want you to --
18     A.  Okay.  Please.
19     Q.  -- be clear.
20     A.  Okay.
21     Q.  So when you told them that signing the
22  Acknowledgement only meant that they were signing
23  receipt of the actual Dispute Resolution Program, the
24  document, did you also inform them that it did not --
25  when they signed for the Acknowledgement, it did not
                                                    Page 21

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Matthew Bodaken

1  mean that they were signing an agreement?
2      A.  I -- I did not consider that.  To me I
3  strictly considered it as an acknowledgement of receipt
4  of information.  So that's as far as I gave information
5  to my crew.
6          I didn't consider it as an agreement or
7  anything further because I -- I didn't consider at the
8  time any potential litigation.  I just considered it as
9  a statement of information from Nordstrom that the crew
10  needed to acknowledge receipt of.  That's as far as I
11  discussed it with them.
12     Q.  And do you know if any employees gained any
13  benefits from the new Dispute Resolution Program?
14     A.  Again, I'd only know of my crew, and no.  None
15  of my crew, no.
16     Q.  Did any of your employees that you work with
17  receive increased wages because of the Dispute
18  Resolution Program?
19     A.  No.
20     Q.  Given any other kind of perks?
21     A.  No.
22     Q.  No reduction in hours?
23     A.  No.
24     Q.  Were you instructed as to whether or not
25  employees could make any changes to the Dispute

Page 22

1  Resolution Program?
2      A.  No.
3      Q.  Were you -- are you aware if employees could
4  make changes to the Dispute Resolution Program?
5      A.  I'm not aware, no.
6      Q.  Did any of the employees that you handed the
7  Dispute Resolution Program out to make any changes to
8  the body of the document?
9      A.  Not that I'm aware of, no.
10     Q.  Did they indicate any changes on their
11  signature line?
12     A.  No.
13     Q.  Did anybody in your department refuse to sign
14  the Acknowledgement form?
15     A.  No.
16     Q.  Is Nune Nalbandian in your department?
17     A.  She is.
18     Q.  And how long have you worked with
19  Ms. Nalbandian?
20     A.  Since 2004.  I believe it was June.  It was
21  prior to our summer sale season.
22     Q.  That's a long time.
23     A.  It is.
24     Q.  Okay.  So you already told us that
25  Ms. Nalbandian was on leave during the time that the

Page 23

1  Dispute Resolution Program was handed out to the other
2  employees in your department; correct?
3      A.  Yes.
4      Q.  And upon her return, I think you already
5  stated that there was a period where you overlapped,
6  that you were working as was Ms. Nalbandian.
7      A.  She and I weren't working together.  She came
8  back, I think, on a Wednesday which was -- it was -- we
9  just had crisscrossed on days that she was working, and
10  I was not there, and I was working and she was not
11  there for, I think, the first six days that she was
12  back effective working.
13         It was either the first five or six days.  I'd
14  have to look, exactly, at the calendar.
15     Q.  And so after that period on the sixth day,
16  let's say on the day that you guys did, in fact, work
17  together, did you follow up with Ms. Nalbandian about
18  the Dispute Resolution Program?
19     A.  Yes.  I inquired as to whether or not it had
20  been taken care of, whether or not she had received it,
21  seen it, signed it, and turned it into human resources.
22     Q.  Now, did you understand that to be your role
23  and your responsibility to make sure that the employees
24  in your department had signed the Acknowledgement form?
25     A.  Yes.

Page 24

1      Q.  At that time, did Ms. Nalbandian communicate
2  that she had or had not signed the Acknowledgement
3  form?
4      A.  She had received it but -- or she had seen it
5  and not signed it yet or not turned it back in.
6      Q.  Did she provide you with a reason?
7      A.  My understanding was she wanted to still -- to
8  get some more information about it.
9      Q.  Did she ask you any specific questions about
10  the new Dispute Resolution Program?
11     A.  No.
12     Q.  Did you instruct her to speak to HR?
13     A.  I did.
14     Q.  Now, if you recall, how many days after you --
15  your first encounter with Ms. Nalbandian, upon her
16  return and upon your return from vacation, do you know
17  did Ms. Nalbandian go and speak with HR about the
18  Dispute Resolution Program?
19         MS. STRAUSS:  Objection.  Calls for
20  speculation.  Lacks foundation.
21         You can answer.
22         THE WITNESS:  I would -- yeah.  I don't know
23  exactly.  I believe it was taken care of within,
24  probably, the next two to three days.  If I recall
25  right -- and, again, I'm estimating on this is -- it

Page 25

Gina Balasanyan vs. Nordstrom, Inc.                           **Deposition of Matthew Bodaken**

| | |
|---|---|
| 1 would have been the following -- the following -- early | 1  A.  No.  Yeah.  No, I don't -- I was not -- yeah. |
| 2 the following week is when she would have got it taken | 2 I didn't feel, like, it was a opportunity for reprimand |
| 3 care of with human resources, and it would have been on | 3 or anything of that sort.  If that's what you're asking |
| 4 a day that I was not working. | 4 me, no. |
| 5 BY MS. SHAMTOUB: | 5  Q.  Was it an opportunity to show outstanding |
| 6  Q.  Did you -- until Ms. Nalbandian, actually, | 6 managerial skills if you were to have your employees |
| 7 went up to -- or went into HR to speak with them about | 7 turn around the Acknowledgement quickly? |
| 8 the Dispute Resolution Program, did you follow up with | 8  A.  No.  Not that either.  It was a daily duty, |
| 9 her daily about having -- having -- about signing the | 9 essentially. |
| 10 Acknowledgement? | 10  Q.  Prior to today's deposition, were you aware |
| 11  A.  I don't recall discussing it with her after | 11 that Ms. Nalbandian was involved in litigation? |
| 12 that.  I -- I recall going to human resources the | 12  A.  I became aware of it, yes. |
| 13 following week on a day -- it was, probably, again, a | 13  Q.  And aside from conversations you had with |
| 14 day that she and I schedules were opposite. | 14 Counsel, that you can't disclose, how were you made -- |
| 15  And I asked and they -- human resources | 15 were you made aware of Ms. Nalbandian's litigation? |
| 16 informed me at that time that they had a copy of | 16  A.  By our human resources department. |
| 17 her (sic) -- and had just acknowledged that she had | 17  Q.  And when were you informed of Ms. Nalbandian's |
| 18 received it.  And that was -- after that, I did not | 18 litigation? |
| 19 broach the subject with Nune anymore. | 19  A.  Looking back on it, it would have been the |
| 20  Q.  Did Ms. Nalbandian speak to you after she | 20 week of October 17th, I believe.  It was either the |
| 21 spoke with the HR department about her interactions | 21 17th or 18th, which I believe was a Monday or Tuesday. |
| 22 with the HR department regarding the Dispute Resolution | 22  Q.  And what, specifically, were you told? |
| 23 Program? | 23  A.  Just that there was a possibility of a lawsuit |
| 24  A.  Not that I recall, no. | 24 or a lawsuit involved, and that I might have to discuss |
| 25  Q.  Did she inform you that she hadn't signed the | 25 things with Counsel and possibly give a deposition. |
| Page 26 | Page 28 |
| 1 Acknowledgement? | 1  Q.  Were you informed about the substance of the |
| 2  A.  She did not, no. | 2 lawsuit? |
| 3  Q.  Prior to Ms. Nalbandian speaking to HR about | 3  A.  In general terms that it involved the Dispute |
| 4 the Dispute Resolution Program, were you receiving | 4 Resolution Program and also -- just that it involved |
| 5 reminders from HR to have Ms. Nalbandian sign the | 5 Nune. |
| 6 Acknowledgement? | 6  Q.  So just to clarify -- and actually I apologize |
| 7  A.  Not per se, no.  It was more -- I had | 7 if you had already answered this. |
| 8 discussed it -- we had discussed it one of those days, | 8  After Nune spoke with HR, did you ask her |
| 9 again, when we were crisscrossing schedules. | 9 whether she had signed the Dispute Resolution |
| 10  And so this has -- it -- and I had | 10 Program -- the Acknowledgement to the Dispute |
| 11 mentioned -- when I discussed it with human resources, | 11 Resolution Program? |
| 12 I also discussed with my -- whether the other employee | 12  A.  No.  I -- once I was informed by HR it had |
| 13 had resolved it.  They said, yes.  That one had, but | 13 been handled or been resolved, I didn't consider it |
| 14 Nune's we still needed to get it taken care of. | 14 anymore. |
| 15  So I think that was the only discussion I had. | 15  Q.  Were you ever informed by HR that she hadn't |
| 16 I wasn't getting daily -- any daily notice or anything | 16 signed the Dispute Resolution Program, the |
| 17 of that sort reminding me to get it taken care of.  It | 17 Acknowledgement to the Dispute Resolution Program? |
| 18 was just that one discussion, that was that next time | 18  A.  Yeah.  That was -- that was the discussion |
| 19 when I asked Nune whether it was getting taken care of. | 19 that we had.  Just that they had -- they had |
| 20  And then the following week, when I spoke to | 20 acknowledged that she had received it, and that was, |
| 21 human resources, and they said they had acknowledged it | 21 essentially, all they were going to need. |
| 22 from her, and that was -- that was the end of it. | 22  Yeah.  All they were going to need in terms of |
| 23  Q.  Did you feel that you could get -- it would be | 23 my responsibility, the matter was done.  I didn't have |
| 24 a reflection on you if the employees in your department | 24 any further responsibilities in that. |
| 25 did not sign their Acknowledgement form? | 25  Q.  Did anybody else inform you, other than HR, |
| Page 27 | Page 29 |

Gina Balasanyan vs. Nordstrom, Inc.                              **Deposition of Matthew Bodaken**

| | |
|---|---|
| 1 that Nune, Ms. Nalbandian, hadn't signed the | 1    MS. STRAUSS: Objection. Outside the scope. |
| 2 Acknowledgement? | 2 You can answer it based on what you know. |
| 3    A.  No. | 3    THE WITNESS: It -- it depends on the |
| 4    Q.  And during your employment with Nordstrom, | 4 insurance program, I believe, they're enrolled in. |
| 5 were there any other instances where Nordstrom required | 5 I -- there's some human resource issues that I'm not |
| 6 current employees to acknowledge receipt of a change to | 6 100 percent clear on with that. |
| 7 the Dispute Resolution Program? | 7    But I know it's based on -- part of their |
| 8    MS. STRAUSS: Objection. Lacks foundation. | 8 eligibility on insurance benefits is based upon the |
| 9 Calls for speculation. | 9 hours that they work. So full-time employees tend to |
| 10    And you can answer based on what you know. | 10 be more accessible to that -- if I understand it -- how |
| 11    THE WITNESS: No. That was -- that's the only | 11 the program works. |
| 12 time I recall having to do with a Dispute Resolution | 12 BY MS. SHAMTOUB: |
| 13 that we had to sign acknowledgement. | 13    Q.  And do you know how many hours a week is |
| 14 BY MS. SHAMTOUB: | 14 considered full-time for your department? |
| 15    Q.  Okay. And so, as your role of manager, you | 15    A.  Thirty-five is probably -- would -- I would |
| 16 assign the schedule for the employees that you work | 16 consider it to be -- we tend to schedule eight-and-a- |
| 17 with; correct? | 17 half-hour shifts, but it really -- it fluctuates, but I |
| 18    A.  Yes. | 18 would -- as a blanket term, I would say 35. |
| 19    Q.  And you stated prior that you have four | 19    Q.  So do the number of hours assigned to your |
| 20 employees that you supervise? | 20 employees change per pay period? |
| 21    A.  Yes. | 21    A.  They do. It -- yes. |
| 22    Q.  And are all of those employees full-time | 22    Q.  And how do you determine the number of hours |
| 23 employees? | 23 assigned to each employee in your department? |
| 24    A.  No. | 24    A.  I -- on a monthly basis, I'm given -- through |
| 25    Q.  How many employees are full-time? | 25 our human resources department, store manager -- a |
| Page 30 | Page 32 |
| 1    A.  Full time -- essentially, if -- to explain it | 1 number of hours that is available to the entire |
| 2 to you, it's what their availability is. Three of them | 2 department to schedule. From that, I attempt to cover |
| 3 are available as full-time employees. Meaning, that | 3 the floor. |
| 4 they are -- would like to work or available to work | 4    And when I say "cover the floor," make sure |
| 5 40 hours a week, and the fourth employee is not -- | 5 there's enough sales people available to assist |
| 6 that's limited employee -- excuse me. There is limited | 6 customers, over the course of the month, in a manner I |
| 7 hours available. | 7 think would best service the people that might want to |
| 8    Q.  How many hours -- sorry for cutting you off. | 8 shop. |
| 9    Were you going to continue? | 9    Q.  And do you do that in conjunction with other |
| 10    A.  That's -- I'm sorry. I was trying to think | 10 managers? |
| 11 back whether or not I had answered your question. | 11    A.  No. I do it based on my area specifically, |
| 12    Q.  No. You answered. | 12 but it -- again, it's -- I schedule based on what -- |
| 13    A.  Okay. | 13 the hours that I'm allotted to the department. |
| 14    Q.  The fourth employee, who you indicated is not | 14    Q.  And how are these hours determined? |
| 15 full-time, how many hours have they indicated they're | 15    A.  My understanding -- human resources/store |
| 16 available to work? | 16 manager does it. It's based on business trends. It's |
| 17    A.  It's weeknights. During the course of the | 17 based on past sales performance the prior year. It's, |
| 18 week, and then weekends. Full availability weeknights | 18 usually, based on a three-month trend prior to that as |
| 19 is usually from 5:00 p.m. on. | 19 well. |
| 20    Q.  So how much -- how many hours a week does that | 20    So depending upon what they foresee in terms |
| 21 translate into? | 21 of sales events and things coming up, they will |
| 22    A.  I -- it would be -- for that individual it's, | 22 designate a certain amount of hours available for a |
| 23 probably, somewhere between 25 to 30 hours. | 23 department to staff. |
| 24    Q.  Now, are full-time employees entitled to | 24    Q.  And then from that number of hours that you |
| 25 benefits that part-time employees are not entitled to? | 25 receive, how do you determine how to distribute those |
| Page 31 | Page 33 |

Gina Balasanyan vs. Nordstrom, Inc.                              **Deposition of Matthew Bodaken**

| | |
|---|---|
| 1 hours to your employees? | 1 that they're doing the job efficiently in all three of |
| 2    A.  It's -- our schedule is -- we rank our | 2 those areas, it's possible, yes.  It's just as possible |
| 3 schedule.  So from in my case, it's from one to four. | 3 in the opposite way. |
| 4 From that I will designate hours based on what is a -- | 4    I mean, if the part-time employee is doing a |
| 5 I work with the sales people, and what is their | 5 better job in all three of those areas, they might get |
| 6 availability. | 6 the different type of hours -- or, you know, a |
| 7    Whereas they may be available full-time, they | 7 different set of hours, so... |
| 8 might have preferential days or times that they are -- | 8 BY MS. SHAMTOUB: |
| 9 they would like to work. | 9    Q.  Now, your determination of the ranking, which |
| 10    So I would take the top person and work my way | 10 is made up of the sales and the service and the |
| 11 down the list in terms of how the employees are ranked, | 11 teamwork, is that based off of Nordstrom's policy of |
| 12 and then I rank them -- I'm giving you the whole -- the | 12 how to rank employees? |
| 13 whole enc- -- the whole enchilada. | 13    A.  I would call it a guideline, yes.  In terms |
| 14    But I rank them based on sales, service, and | 14 of -- it's Nordstrom's guidelines, but it's -- and |
| 15 teamwork.  And so, based on how they are producing in | 15 that's the one thing that, as a manager, I'm allowed to |
| 16 those three areas and how many hours I have available, | 16 work with, again, what I understand of that as well. |
| 17 and then what their availability is, I would then do | 17    So it's -- they allow some leeway.  There's |
| 18 the schedule. | 18 a -- it isn't dictated to me on how to rank people. |
| 19    Q.  If somebody has high sales and they have lower | 19 It's given that this is how we would like you to review |
| 20 teamwork would the highest sales overpower the lower | 20 and maintain the sales associates in the store.  And |
| 21 teamwork? | 21 then I take that information, and then I can do the |
| 22    Well, I guess, what I'm trying to say is: | 22 ranking. |
| 23 Does higher sales take priority over the service and | 23    Q.  Do they have other areas that you're not using |
| 24 the teamwork or are they all on the same footing? | 24 in your ranking? |
| 25    A.  For me, I assess it altogether.  I try to be | 25    A.  No. |
| Page 34 | Page 36 |
| 1 consistent in all three of those areas.  With one area | 1    Q.  And how often do you rank the employees in |
| 2 is very good, but the other area is not, it will affect | 2 your department? |
| 3 the overall performance area.  So that's why I want | 3    A.  It's done on a monthly basis.  So each time we |
| 4 all three of those areas to be consistent and strong. | 4 do the schedules, they want us to review that. |
| 5    Q.  And do you give preference to full-time | 5    Q.  Now, is this something that you do, |
| 6 employees over part-time employees when creating your | 6 personally, or is it something that HR has indicated |
| 7 schedules? | 7 that you have to do? |
| 8    A.  No. | 8    A.  I do -- I do it, personally, but they want us |
| 9    Q.  So you would, essentially, be open to the idea | 9 to consider it on a month-to-month basis. |
| 10 of giving a full-time employee less hours than a | 10    Q.  Okay.  So is Ms. Nalbandian a full-time |
| 11 part-time employee? | 11 employee? |
| 12    MS. STRAUSS:  Objection.  Mischaracterizes the | 12    A.  She has requested full-time availability for |
| 13 testimony. | 13 full-time hours, yes. |
| 14    You can go ahead. | 14    Q.  And I think you stated that you don't think |
| 15    THE WITNESS:  If -- could you repeat the | 15 she's entitled to a certain number of hours because she |
| 16 question back to me just to make sure I'm clear? | 16 is a full-time employee. |
| 17 Sorry. | 17    A.  No.  I don't recall saying that.  She's -- |
| 18    MS. STRAUSS:  Yes.  He can read it back. | 18 she's -- she's got some specific scheduling needs, but |
| 19    (The record was read by the Court | 19 she's -- would she -- depending upon the time, she's |
| 20    Reporter as follows: | 20 available close to full-time hours, so... |
| 21    "Q.  So you would, essentially, be open | 21    But I guess I'm not sure.  "Entitled"?  I |
| 22    to the idea of giving a full-time | 22 guess I'm not sure how to -- the intent of entitled in |
| 23    employee less hours than a part-time | 23 that question so... |
| 24    employee?") | 24    Q.  Thanks for clarifying it, actually. |
| 25    THE WITNESS:  If they're doing -- if I feel | 25    A.  Okay. |
| Page 35 | Page 37 |

Gina Balasanyan vs. Nordstrom, Inc.                              Deposition of Matthew Bodaken

Q. So what restrictions does she have on her
availability?
A. She's -- she's got religious observation
during the course of the week on Saturdays. She'd also
like to consider those possibilities, occasionally, on
Monday and/or Wednesdays. So I try to adjust the
schedule around those.
Q. So she's, essentially, free any time on
Sunday, any time on Tuesdays, Thursday and Friday?
A. Yes. Yes.
Q. Are you aware how many hours Ms. Nalbandian is
currently assigned?
A. This month I'm not. I couldn't give you a
specific answer, no.
Q. How far ahead do you determine the assignment
for your employees? So let me rephrase that because I
don't think it came out quite clear.
So per pay period, you develop a new schedule;
is that correct?
A. Yes.
Q. How far ahead through that pay period do you
develop the schedule?
A. Usually about -- I'll start a schedule roughly
a month ahead of time. So -- and they like us -- human
resources likes for us to post the schedule by the 15th

Page 38

of the prior month.
So, like, in this instance, we would, ideally,
post on November 15th for the December schedule. And
I'll start writing it, probably, around November 1st.
Meaning, I'll have -- start it and roughly give myself,
you know, close to 10 days, two weeks to get a schedule
ready so I can post it on the 15th.
Q. So --
A. Essentially, a month ahead of time. That's a
longwinded way to get to a month ahead of time.
Q. And do you provide -- by posting, do you mean
you provide the schedules to your employees a month --
A. Yes.
Q. -- prior to?
A. Well, no. I post it so it's, roughly, two
weeks prior to the month. So, like, they would get it
November 15th. That's the ideal goal. And so that
would start December 1st through December 31st.
And then I'd do it again, December 15th for
January 1st through the end of the month.
Q. Okay so two weeks before?
A. Two week before the month begins.
Q. Okay.
A. I -- just to clarify that is because when you
say pay period, pay periods are broken in half. We

Page 39

don't do a full month pay period. We do a 1st and
15th, and 16th through the end of the month. That's
why I wanted to be clear.
It's two weeks ahead of the first pay period,
but four weeks ahead of the second pay period.
Q. But you developed each -- so the schedules are
two-week long schedules; correct? Or are they month
long schedules?
A. It's -- I give a month's worth of schedule.
It's broken down --
Q. Okay.
A. -- into two-week periods because that's how we
do our pay.
Q. So do you disseminate the first two-week
portion of the schedule two weeks prior to the start of
that particular pay period?
A. I give the whole month's schedule two weeks
prior to --
Q. Okay.
A. -- the start of the month.
Q. I see. Okay.
A. So half of it is, yes.
Q. So half of it they receive two weeks before.
The other half they're receiving, essentially?
A. Yes.

Page 40

Q. Okay. Thank you for clarifying.
Do you know how many hours are assigned to
your department?
A. It changes on a monthly basis. Again, it's
based on business trends.
Q. Do you know how many hours are assigned this
month?
A. I -- I don't know.
MS. STRAUSS: Outside the scope of the
deposition.
You can go ahead and answer.
THE WITNESS: I -- I don't recall
specifically. I -- it -- it's -- yeah. I don't recall
specifically how many was given.
I -- I know that I use as much as they give us
because they've been scheduling very tight over this
past eight-month period. So if hours are available,
I'm using them.
BY MS. SHAMTOUB:
Q. Okay. So what's Ms. Nalbandian's ranking?
A. Right now she ranks four out of four.
Q. And how long has that been her ranking?
A. It's been pretty consistent. My crew has not
changed in quite some time. I've -- I've got a very
well established crew, and her position has been

Page 41

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Matthew Bodaken

Page 42

1  consistent for a number of years. I'd have to go back
2  to see. It was, probably, when I had more people on
3  the crew it may have changed. But since I've had four
4  people on the crew, she's been, consistently, in that
5  No. 4 spot.
6      Q. How long have you had four people on your --
7  on your team?
8      A. I believe -- It, probably, was around 2008,
9  2009, when business trends really got difficult. I
10 think I may have -- in earlier 2008, I might have had
11 five sales people. I might have had an additional
12 person that we just never rehired because business got
13 very difficult later in that year.
14     Q. Do you know how Ms. Nalbandian ranks in
15 Nordstrom overall for her sales?
16     A. I couldn't tell you, specifically. In -- in
17 terms of the -- I guess, if you're asking me for just
18 the store itself -- like, are you asking me just
19 Glendale, like, where she ranks there, I can only give
20 you an estimate of where that might be. I don't know,
21 specifically, where it is.
22     Q. If you feel comfortable giving an estimate,
23 I'd appreciate that.
24     A. Last year she probably ranked overall in her
25 sales probably somewhere in the top -- in the top 15 to

Page 43

1  20 in employees.
2      Q. And the other four people in your team?
3      A. Were -- two of them were in the top ten, and
4  then the part-time individual was in -- was lower
5  ranked but, probably, in the top 50 in the store.
6      Q. Okay. Do you take that into consideration,
7  the fact that the person -- the part-time was ranked
8  top 50 in the store?
9      A. Sure. Absolutely.
10     Q. But Ms. Nalbandian was topped -- was ranked
11 somewhere in between the 15 to 20 percent in the store.
12     Do you take that into consideration when you
13 determine your ranking within your team?
14     A. Yes. Absolutely, yes.
15     Q. And how does that effect your ranking within
16 your team?
17     A. Again, that's -- that's a part of it. That's
18 a third of it, and that's -- and to me that's
19 significant. It's -- it's the sales part of it.
20     And then, again, service and teamwork are the
21 other two parts that I take into account.
22     Q. So --
23     A. It isn't more significant than the other two
24 parts, I guess, if you're asking me. It's significant.
25 It's sales results, but it's -- again, it's -- service

Page 44

1  and teamwork are, equally, significant.
2      Q. So how does Ms. Nalbandian rank in service?
3      A. It -- if --
4      MS. STRAUSS: I'm gonna object. It's vague.
5  It mischaracterizes the testimony, and I believe
6  they're all considered together.
7      But you can go ahead.
8      THE WITNESS: If you're asking me how --
9  BY MS. SHAMTOUB:
10     Q. Do you --
11     A. Go ahead.
12     Q. Before you come out -- before you come out
13 with your total ranking, do you assign a score or a
14 rank to each component that you're taking into
15 consideration? So a score for the sales, a score for
16 the service, and the score for the teamwork?
17     A. No. I take -- again, it's my assessment, my
18 personal assessment. I take all three of those factors
19 into account.
20     Q. So then how do you perceive Ms. Nalbandian's
21 service?
22     A. If you're asking me in a general term, I feel
23 she's -- she does a very good job. I feel my entire
24 crew does a very good job. I feel the four individuals
25 I have working for me are four of the best service

Page 45

1  individuals in the store.
2      In over 250 employees, I think, I, probably,
3  have four out of the top ten overall. And so I feel
4  she is -- individually, she does a good job servicing
5  the customers.
6      Q. I believe you stated that you didn't know how
7  many hours were assigned to Ms. Nalbandian within --
8      A. I couldn't say specifically for, like, if
9  you're asking me for this pay period. No. I know that
10 it's not -- it's -- just from discussions with her,
11 that she would like more hours.
12     So I can't tell you, like, she's working, you
13 know, 39 and a half hours this pay period. I don't
14 know, specifically, how much it is.
15     Q. Do you know if her -- the time that's been
16 assigned to her has stayed consistent throughout, let's
17 say, the past six months?
18     A. It's been -- it's been -- it's been less, and
19 it's in part because where she ranks on the schedule,
20 and it's the amount of hours that I have available
21 given to me.
22     The store has made a conservative effort
23 across the board in terms of how they designate hours
24 to us. The scheduling process was different a year
25 ago -- 8, 10, 12 months ago -- where we were allowed,

Gina Balasanyan vs. Nordstrom, Inc.                              Deposition of Matthew Bodaken

| | |
|---|---|
| 1 as managers, to schedule to needs a bit more, and then | 1    Can you describe what this document |
| 2 they would review it at the end of the month. | 2 represents? |
| 3     Now they're reviewing it prior, and so I'm not | 3    A.  This is our -- what we call -- |
| 4 getting as many hours that I'm scheduled, and so she | 4    MS. STRAUSS:  And Counsel, just before he |
| 5 designate -- human resources, store managers, designate | 5 gives a description of it, I can't read all of this, |
| 6 what I can schedule.  And so her hours, ranked No. 4 | 6 but it looks like there's sales volume information on |
| 7 are less than they were, I'm sure, a year ago at this | 7 here. |
| 8 time. | 8    That would, obviously, be pretty sensitive to |
| 9    Q.  Were her hours decreased after her return from | 9 the company.  So is it possible for us to redact that |
| 10 disability leave? | 10 on a version that gets submitted to the court reporter? |
| 11    A.  She would notice that in part because we just | 11    MS. SHAMTOUB:  Yes. |
| 12 came out of two big sales, and so it's -- as a whole, | 12    MS. STRAUSS:  So we don't have to do it -- |
| 13 the department's hours went down significantly from | 13    MS. SHAMTOUB:  Yes. |
| 14 where they were. | 14    MS. STRAUSS:  Great.  Thank you. |
| 15    We had our two busiest sales of the summer | 15    Go ahead. |
| 16 season during that time, and then from that, when she | 16    Could you read the question back for him. |
| 17 returned, our business trends was significantly less. | 17    (The record was read by the Court |
| 18    Our sales results weren't as strong as we had | 18    Reporter as follows: |
| 19 hoped so the hours designated to me were less.  And so | 19    "Q.  Okay.  And it's made up of -- |
| 20 her -- what she was, probably, used to, I would | 20    there's four pages or five pages.  So |
| 21 imagine, was a good deal less. | 21    please feel free to thumb through all |
| 22    Q.  Were any of the other hours -- the hours for | 22    of them. |
| 23 your other employees, the three other employees, | 23    Can you describe what this document |
| 24 decreased as well? | 24    represents?") |
| 25    A.  To some extent, yes.  Probably not as much as | 25    THE WITNESS:  This is the department schedule. |
| Page 46 | Page 48 |
| 1 hers. | 1 BY MS. SHAMTOUB: |
| 2    Q.  And why would hers be decreased the most? | 2    Q.  Okay.  And -- |
| 3    A.  Where she ranks on the schedule. | 3    A.  The form I use. |
| 4    MS. SHAMTOUB:  So I, actually, have a -- we'll | 4    Q.  To the left side, to the column, under |
| 5 mark this as an exhibit. | 5 "September" and then "Date" -- |
| 6    THE WITNESS:  Okay. | 6    A.  Okay. |
| 7    MS. SHAMTOUB:  Exhibit 1. | 7    Q.  -- on the first page. |
| 8    (Plaintiffs' Exhibit 1 was marked for | 8    A.  Okay. |
| 9    identification by the Court Reporter, | 9    Q.  The people that are listed, are these the |
| 10    and a copy is attached hereto.) | 10 people that are in your department? |
| 11 BY MS. SHAMTOUB: | 11    A.  They are, yes. |
| 12    Q.  And I'm going to hand you this copy, but if | 12    Q.  And can you identify which of these people is |
| 13 you could please, at the end, hand it over to the court | 13 the part-time person? |
| 14 reporter. | 14    A.  It would be Mike. |
| 15    A.  Sure. | 15    Q.  Okay.  So I'll put a little asterisk there. |
| 16    Q.  This may not be the best copy. | 16    A.  Uh-huh. |
| 17    A.  I might need a little help because my eyesight | 17    Q.  Now, if you would please help me out here. |
| 18 is a little rough. | 18    A.  Sure. |
| 19    Q.  I apologize for that, but if you could help me | 19    Q.  Under each column, third row in each column is |
| 20 out. | 20 divided up by VOS and NS; correct? |
| 21    Do you recognize this document? | 21    A.  It's -- S is selling time.  NS is non-sale, |
| 22    A.  Yes. | 22 and it's time worked is what that first column is. |
| 23    Q.  Okay.  And it's made up of -- there's four | 23 It's a scheduling time to work, and I'm -- I -- yeah. |
| 24 pages or five pages.  So please feel free to thumb | 24 I don't know what those initials are.  I'm sorry. |
| 25 through all of them. | 25    Q.  It represents the time -- |
| Page 47 | Page 49 |

**Hines Reporters**

Exhibit 7  13

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Matthew Bodaken

| | |
|---|---|
| 1  A. The time they're scheduled to work. | 1  Q. So if you can't make it out, I understand. |
| 2  Q. Okay. | 2  Do you know how much Nune is assigned? |
| 3  A. So time scheduled to work, whether it's | 3  A. I'm having a tough time reading that too. It |
| 4  selling hours or non-selling hours. That's the three | 4  looks, like, maybe, 41 and a half hours. |
| 5  columns as they go over. | 5  MS. STRAUSS: Just object that the document |
| 6  Q. So, for instance, if we can take a look at | 6  speaks for itself. |
| 7  Nune's -- | 7  BY MS. SHAMTOUB: |
| 8  A. Okay. | 8  Q. And do you know how many hours Adel is |
| 9  Q. -- going across. | 9  assigned? |
| 10  Can you take a moment -- and you can take as | 10  A. I'm having a tough time reading that one. I'm |
| 11  much time as you need -- to calculate how many hours | 11  trying to look at it to see because I know he was on a |
| 12  were assigned to Nune for this two-week period. | 12  little bit of a vacation at the start of it. |
| 13  MS. STRAUSS: And object 'cause the document | 13  I believe it -- it's at 70, but I'm -- I |
| 14  speaks for itself, and there's no way that I could read | 14  believe it's 70 hours. |
| 15  them to calculate them, but go ahead. | 15  Q. And can you tell me how many hours Mike is |
| 16  THE WITNESS: Yeah. It's -- that's what I was | 16  assigned? |
| 17  going to say. The total -- it -- obviously, like I | 17  A. I can't read that. He's on vacation at the |
| 18  said -- | 18  start of it. My best estimate is probably -- I think |
| 19  BY MS. SHAMTOUB: | 19  it says 25 and a half hours, but I might be -- that |
| 20  Q. There's a total on the side. | 20  might be -- I think that's 25 and a half. |
| 21  A. It's on the side. It's on the right-hand side | 21  Q. And then Karineh? |
| 22  underneath. So if I could read that correctly -- | 22  A. Karineh looks -- gosh, I can't. |
| 23  Q. You're quicker than I am. | 23  MS. STRAUSS: Same objection. The document |
| 24  A. That's 54. | 24  speaks for itself. I mean, if the witness has an |
| 25  Q. I didn't see that before. Okay. | 25  independent recollection, that's perfectly fine, but |
| Page 50 | Page 52 |
| 1  So 54 is Nune. Mike is the part-time | 1  don't guess if you can't calculate. |
| 2  individual? | 2  THE WITNESS: I'm sorry. I'm just having a |
| 3  A. Uh-huh. | 3  difficult time reading it. It looks like Karineh |
| 4  Q. And he's assigned 46; is that correct? | 4  worked the most hours that particular pay period. |
| 5  A. I believe so. It looks like it says 46 and a | 5  BY MS. SHAMTOUB: |
| 6  half. | 6  Q. And then in the lower portion of -- |
| 7  Q. What -- what ranking does Mike have? | 7  A. The first page? |
| 8  A. Mike is ranked second to the department. | 8  Q. They're consistent on all pages. There's an |
| 9  Q. What ranking does -- Adel? | 9  indication of early, mid and late. |
| 10  A. Yeah, Adel. | 10  Does that stand for the shift? |
| 11  Q. Adel. | 11  A. Exactly, yes. |
| 12  A. He's first in the department. | 12  Q. And how do you assign shifts to your |
| 13  Q. And Karineh? | 13  employees? |
| 14  A. Yeah, Karineh. She's third. | 14  A. Based on -- shifts are, usually, assigned |
| 15  Q. Third, okay. So Karineh is given 64 hours? | 15  based on availability, and then it's, also, in part on |
| 16  A. In that pay -- particular pay period, yes. It | 16  what the need is for that particular day, depending |
| 17  looks like she's at 64. | 17  upon if there's an event, a promotion, a sale -- |
| 18  Q. Can we move over to the next page. | 18  something rung during that time. |
| 19  A. Sure. | 19  So I would -- you know, depending upon -- if |
| 20  Q. And the rankings, we're assuming, are staying | 20  there's a lot of activity, I might have multiple |
| 21  the same? | 21  shifts. If there's not much activity, I might have one |
| 22  A. Yeah. It's consistent. | 22  or two shifts. |
| 23  Q. And here, if you could just help me, it's | 23  Q. Are there particular shifts that are more |
| 24  difficult for me to read. | 24  preferable than other shifts? |
| 25  A. Yeah. | 25  A. It -- in my perspective -- and especially |
| Page 51 | Page 53 |

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Matthew Bodaken

| | |
|---|---|
| 1  now -- any shift is -- has the ability to be | 1  don't remember, specifically, when it was. It was |
| 2  productive. As experienced as the sales crew is, any | 2  probably -- she came back the middle of September. The |
| 3  particular shift can be productive. | 3  discussion, probably, would have been sometime in |
| 4      Saturday is, usually, the highest foot traffic | 4  October. |
| 5  day, if you're asking, but it's, also, the day with | 5      I -- I'm sorry. I can't give any specific |
| 6  most of the sales people working. So any benefit you | 6  date or anything like that. It would have been |
| 7  gain, you may -- I think you can take just as much | 7  sometime in October. |
| 8  benefit if you're the only individual working on that | 8      Q. And what was the contents of that discussion? |
| 9  particular day during the week, so... | 9      A. It was -- only her request if, you know -- she |
| 10      Q. And has Ms. Nalbandian expressed any desire | 10  would like to be scheduled for more hours. |
| 11  for any particular shift? | 11      Q. Did she express to you, at that time, that, |
| 12      A. Yes. As I mentioned earlier, in part it's due | 12  prior to taking leave, she had had more hours? |
| 13  to, you know, some of her religious request in terms of | 13      A. No. No, that wasn't any discussion in that |
| 14  things. And then if she needed to work on specific | 14  regard, no. |
| 15  days or a couple days, certain times that she would | 15      Q. Prior to taking disability leave, did she |
| 16  like to work, I try to take that into account. | 16  speak to you about making sure that her hours wouldn't |
| 17      Q. So, again, you had, previously, stated that | 17  be reduced upon her return from leave? |
| 18  there's specific days that she'd like to work, but | 18      A. No. That wasn't -- yeah. That wasn't any -- |
| 19  within those days, did she indicate any specific shifts | 19  I mean, she took the leave to take care of her health, |
| 20  that she would prefer? | 20  and so the intent was to take the time she needed to be |
| 21      A. On those particular days, yes. The rest of | 21  healthy so that she wouldn't -- when she returned, she |
| 22  the days, she's pretty open in terms of what her | 22  would be available to work and not work on a limited |
| 23  availability is. | 23  basis. |
| 24      Q. I see. So on the days that you indicated | 24      Q. Did you ever indicate to her that you think |
| 25  before, the, I think, it was the Mondays and | 25  she should find another job? |
| Page 54 | Page 56 |
| 1  Wednesdays -- | 1      A. No. I never, specifically, said to her |
| 2      A. Saturdays. | 2  anything to that extent, no. |
| 3      Q. -- and Saturdays, she's available, but only on | 3      Q. Have you said something to her not, |
| 4  particular shifts? | 4  specifically, to that extent, similar to that, |
| 5      A. Yes. Exactly. | 5  conveying that idea? |
| 6      Q. Okay. | 6      MS. STRAUSS: Wait. Wait. Objection. Vague |
| 7      A. I just -- I just -- I wanted to try to clarify | 7  as to time. Ever, in the whole period she's worked for |
| 8  that. So if I would need to schedule her on one of | 8  him? |
| 9  those days, I would try to, as best I can, to | 9  BY MS. SHAMTOUB: |
| 10  accommodate her schedule requests. | 10      Q. No. In the past six months? |
| 11      Q. But on the other days, she's available | 11      A. Past six months, no. No. |
| 12  anytime? | 12      Q. Upon her return from disability leave, did you |
| 13      A. Correct. | 13  ever make any comments to her that would otherwise |
| 14      Q. And she hasn't otherwise indicated a | 14  indicate that she shouldn't work at Nordstrom? |
| 15  preference for any shift? | 15      A. No. No. |
| 16      A. Yes, correct. I try to take that -- outside | 16      Q. And following Ms. Nalbandian's return from |
| 17  life to me is important. So I try to take that into | 17  disability leave, did the HR department speak to you |
| 18  account as much as I can. | 18  about any reduction in hours in Ms. Nalbandian -- any |
| 19      Q. Now, following Ms. Nalbandian's return from | 19  reduction in Ms. Nalbandian's hours? |
| 20  disability leave and -- did she indicate that her hours | 20      A. Nothing specific to Nune, no. |
| 21  were decreased? | 21      Q. Did they speak to you regarding any reduction |
| 22      A. We had a discussion about it later, not | 22  of hours for your employees? |
| 23  immediately upon her return, no. | 23      A. As I mentioned prior, we've -- hours have been |
| 24      Q. When did you have this discussion? | 24  very stringent in terms of how the schedule was done. |
| 25      A. Yeah. I'm sorry. That's why I hesitated. I | 25  And so it was -- I'm -- myself as well as the entire |
| Page 55 | Page 57 |

**Hines Reporters**

Exhibit 7 15

Gina Balasanyan vs. Nordstrom, Inc.                                    **Deposition of Matthew Bodaken**

| | |
|---|---|
| 1  store, is -- we're scheduling based on trends. And so | 1       MS. SHAMTOUB: And then stipulate to relieve |
| 2  hours, for the most part are -- if your business trend | 2  the court reporter of their (sic) duty. |
| 3  if poorer, your hours are less than what they were. | 3       MS. STRAUSS: With respect to the retention of |
| 4       So -- but it wasn't specific to Nune. It | 4  the original transcript, I do. |
| 5  wasn't specific to any individual. It was more general | 5       And if it's, also, possible to redact these |
| 6  that we are not scheduling as many as we were last | 6  last numbers at the bottom if you don't need them, I'd |
| 7  year. | 7  prefer that too. |
| 8     Q.  So they never told you to increase the hours | 8       MS. SHAMTOUB: That's not a problem at all. |
| 9  that were assigned to Nune? | 9       MS. STRAUSS: So we'll also redact of the |
| 10    A.  No. Increase or decrease, no. | 10  version of the document that we were just looking at, |
| 11      MS. SHAMTOUB: Okay. That's all the questions | 11  the numbers that are at the bottom of the table. |
| 12  I have for you. If Lara has any follow-up questions | 12      THE WITNESS: It says "Department SBH." |
| 13  for you then. | 13      MS. STRAUSS: "Department SBH." |
| 14      MS. STRAUSS: I do not have any questions. We | 14      Thank you, Counsel. And otherwise, so |
| 15  just would ask to reserve the right to make any changes | 15  stipulated. |
| 16  to the deposition transcript. | 16      MS. SHAMTOUB: Yes. Okay. |
| 17      THE WITNESS: Okay. | 17      MS. STRAUSS: A copy for everything today, |
| 18      MS. STRAUSS: And then if we could just | 18  thanks. |
| 19  clarify for the record. I don't think you need this, | 19      (Whereupon, the proceedings recessed at |
| 20  but the portion that would be redacted would include | 20      the hour of 3:23 p.m.) |
| 21  the five lines with all of the numbers in them under -- | 21 |
| 22      THE WITNESS: It's HM -- it's HMCYS, that's | 22 |
| 23  how much can you sell. | 23 |
| 24      MS. STRAUSS: Great. | 24 |
| 25      THE WITNESS: That's underneath "managers," so | 25 |
| Page 58 | Page 60 |
| 1  right underneath my name. | 1       I certify or declare under |
| 2       MS. SHAMTOUB: Okay. Mr. Bodaken, the | 2  declaration under penalty of perjury |
| 3  original of the transcript will be sent to your | 3  that the foregoing testimony is true |
| 4  attorney. | 4  and correct. |
| 5       THE WITNESS: Okay. | 5 |
| 6       MS. SHAMTOUB: Your attorney -- you'll have | 6       Executed this _____ day of |
| 7  15 days to review the transcript. At that time, you | 7       _____, |
| 8  could make any of the changes that we spoke of | 8  2011, at _____, |
| 9  before -- | 9  California. |
| 10      THE WITNESS: Okay. | 10 |
| 11      MS. SHAMTOUB: -- if you think it's necessary. | 11 |
| 12      If not, you'll just sign. Your attorney will | 12 |
| 13  have five days to notify us of any changes made to the | 13 |
| 14  deposition transcript. | 14 |
| 15      If we don't receive notice within five days, | 15      ~~MATTHEW BODAKEN~~ |
| 16  then we'll assume that no changes have been made to the | 16 |
| 17  transcript, and that the original has been signed by | 17 |
| 18  you. | 18 |
| 19      THE WITNESS: Okay. | 19 |
| 20      MS. SHAMTOUB: The original will be maintained | 20 |
| 21  at your attorney's office, who will then produce that | 21 |
| 22  at the time of trial. If the original is unavailable | 22 |
| 23  or destroyed, then a certified copy could be used in | 23 |
| 24  lieu thereof. | 24 |
| 25      THE WITNESS: Okay. | 25 |
| Page 59 | Page 61 |

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Matthew Bodaken

```
 1  STATE OF CALIFORNIA      )
 2  COUNTY OF LOS ANGELES    )
 3
 4      I, WILLIE ANDERSON, JR., Certified Shorthand
 5  Reporter qualified in and for the State of California,
 6  do hereby certify:
 7      That the foregoing transcript is a true and
 8  correct transcription of my original stenographic
 9  notes.
10      I further certify that I am neither attorney or
11  counsel for nor related to or employed by any of the
12  parties to the action in which this proceeding was
13  taken; and furthermore, that I am not a relative or
14  employee of any attorney or counsel employed by the
15  parties hereto or financially interested in the action.
16      IN WITNESS WHEREOF, I have hereunto set my hand
17  this _____ day of _____, 2011.
18
19
20
21      _____
22          WILLIE ANDERSON, JR.
23          CSR No. 13385
24
25
                                    Page 62
```

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Matthew Bodaken

```
1              I certify or declare under

2         declaration under penalty of perjury

3         that the foregoing testimony is true

4         and correct.

5

6         Executed this  24  day of

7         December         ,

8         2011, at   Glendale         ,

9         California.

10

11

12

13

14         _____
                  MATTHEW  BODAKEN
15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 7

1    STATE OF CALIFORNIA      )

2                             )  ss

3    COUNTY OF LOS ANGELES    )

4        I, Willie Anderson, Jr., Certified Shorthand Reporter

5    qualified in and for the State of California, do hereby

6    certify:

7            That the foregoing transcript is a true and

8    correct transcription of my original stenographic notes.

9            I further certify that I am neither attorney or

10   counsel for, nor related to or employed by any of the parties

11   to the action in which this proceeding was taken; and

12   furthermore, that I am not a relative or employee of any

13   attorney or counsel employed by the parties hereto or

14   financially interested in the action.

15       IN WITNESS WHEREOF, I have hereunto set my hand

16   this 5th of December, 2011.

17

18

19                         Willie Anderson, Jr.,
                           CSR No. 13385

20

21

22

23

24

25

HinesReporters.Com, Inc.

**Exhibit 7**



Exhibit 7



**Exhibit 7**



NORDSTROM

Mens_Clothing_Nov11_Schedule.xls | Pay Period 16 - EOM

PRINTED ON 10/20/2011

| November DATE | Wednesday 16 | Thursday 17 | Friday 18 | Saturday 19 | Sunday 20 | Monday 21 | Tuesday 22 | Wednesday 23 |
|---|---|---|---|---|---|---|---|---|
| Store Hours / Events / Goals | 10 - 9 | 10 - 9 | 10 - 9 | 10 - 8 | 11 - 7 | 10 - 8 | 10 - 9 | 10 - 8 Happy B-Day Hubert |
| NAME add | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS |
| Adel | 5/d 4.5 | / | 12/8 7.0 | 12/d 7.5 | 11.3/7 6.5 | / | / | 11.2/d 8.0 |
| Mike | / | 5/d 4.5 | / | 9.3/6 7.5 | 10.3/6 8.5 | 5/d 4.5 | 5/d 4.5 | R |
| Karineh | 9.2/5 8.5 | / | 1.3/d 7.0 | 11.3/8 7.5 | / | 12/8 7.0 | 12/8 7.0 | / |
| Nune | 12/8 7.0 | 12/8 7.0 | R | / | 12/d 8.5 | / | / | 9.3/6.3 8.0 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Early | 1 | | | 1 | | | | |
| Mid | 1 | 1 | 1 | 2 | | | | 1 |
| Late | 1 | 1 | 1 | 1 | | 1 | 1 | 1 |
| SUPPORT add | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS |
| | | | | | | | | |
| | | | | | | | | |
| MANAGERS add | I/O S | I/O S | I/O S | I/O S | I/O S | I/O S | I/O S | I/O S |
| Matt | / | 8/5 2.0 | 8/5 [illegible] | 8/5 2.0 | / | 8/5 2.0 | 8/5 2.0 | off per Gib |
| HMCYS Volume / Mgmt Volume / Crew Volume / % Inc/Dec / LY Volume | [redacted] | | | | | | | |
| Total Sell Hours | 19.0 | 13.5 | 16.0 | 24.5 | 19.5 | 13.5 | 13.5 | 16.0 |
| Mgmt Sell Hours | 0.0 | 2.0 | 2.0 | 2.0 | 0.0 | 2.0 | 2.0 | 0.0 |
| Crew Sell Hours | 19.0 | 11.5 | 14.0 | 22.6 | 19.5 | 11.5 | 11.5 | 16.0 |
| Support Hours | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total N/S Hours | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Dept SPH / Mgmt SPH / Crew SPH | [redacted] | | | | | | | |

| November DATE | Thursday 24 | Friday 25 | Saturday 26 | Sunday 27 | Monday 28 | Tuesday 29 | Wednesday 30 | | Totals |
|---|---|---|---|---|---|---|---|---|---|
| Store Hours / Events / Goals | Happy Thanksgiving | 8 - 9 | 9 - 9 | 10 - 8 | 10 - 9 | 10 - 9 | 10 - 9 | | |
| NAME add | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS | I/O S NS | |
| Adel | H | 12.3/9 7.5 | 1/d 7.5 | 11/7.3 7.5 | 12/8 7.0 | / | / | | 83.0 |
| Mike | O | 9/5.3 7.5 | 8.2/5 7.5 | 9.3/8 7.5 | / | 5/d 4.5 | / | | 54.5 |
| Karineh | L | 11.3/8 7.5 | 12/8.3 7.5 | / | 1.3/d 7.0 | 12/8 7.0 | 8.2/8 7.5 | | 71.5 |
| Nune | I | 1.3/d 7.0 | 9.3/8 7.5 | 12.3/d 7.0 | / | 9.2/5 6.5 | 1/d 7.5 | | 64.0 |
| | D | | | | | | | | 0.0 |
| | A | | | | | | | | 0.0 |
| | Y | | | | | | | | 0.0 |
| Early | | 1 | 1 | 1 | | 1 | 1 | | 0.0 |
| Mid | | 2 | 2 | 1 | 1 | 1 | 1 | | |
| Late | | 1 | 1 | 1 | 1 | 1 | 1 | | |
| SUPPORT add | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS | I/O NS | |
| | | | | | | | | | 0.0 |
| | | | | | | | | | 0.0 |
| MANAGERS add | I/O S | I/O S | I/O S | I/O S | I/O S | I/O S | I/O S | I/O S | |
| Matt | | 7/5 2.0 | PTO | 9.3/5 2.0 | 8/5 2.0 | 1/d 8.0 | / | | 66.5 |
| | | | | | | eve MIC | | | 0.0 |
| HMCYS Volume / Mgmt Volume / Crew Volume / % Inc/Dec / LY Volume | [redacted] | | | | | | | | |
| Total Sell Hours | 0.0 | 31.5 | 30.0 | 24.0 | 16.0 | 18.0 | 15.0 | 0.0 | 269.0 |
| Mgmt Sell Hours | 0.0 | 2.0 | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 0.0 | 66.5 |
| Crew Sell Hours | 0.0 | 29.5 | 30.0 | 22.0 | 14.0 | 18.0 | 15.0 | 0.0 | 253.0 |
| Support Hours | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total N/S Hours | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Dept SPH / Mgmt SPH / Crew SPH | [redacted] | | | | | | | | |

| EARN TYPE | TY Payroll $ | TY Hours | LY Hours |
|---|---|---|---|
| Selling Hours | | 253 | |
| Selling OT | | | |
| Support | 0 | 0 | |
| Support OT | | | |
| Non-Sell | 0 | 0 | |
| Commissions | 0 | | |
| Paid Holiday | 0 | | |
| Worked Holiday | 0 | | |
| SUB TOTAL | 0 | 253 | |
| Misdraw | | | |
| GRAND TOTAL | 0 | 253 | |

| | |
|---|---|
| AVERAGE HOURLY SUPPORT RATE | |
| AVERAGE NON-SELL RATE | |
| PAID HOLIDAY RATE | |
| WORKED HOLIDAY RATE | |
| DEPARTMENT COMMISSION % | |
| THIS YEAR MONTH END SELLING COST<br>Payroll $ Divided by TY Projected Volume | 0.00% |
| LAST YEAR MONTH END SELLING COST | |

DEPARTMENT: Men's Clothing

PTR GROUP: Men's Clothing

PAY PERIOD: November 16 - EOM, 2011

| | |
|---|---|
| Payperiod 1-15 % Inc/Dec | 11% |
| Payperiod 16-EOM % Inc/Dec | -6% |
| Total Month % Inc/Dec | 0% |

PTR Range

| | |
|---|---|
| Rating 3 Low | $265 |
| Rating 2 Low | $199 |

Crew SPH Total Key:
Above PTR 2
Within PTR 2
Below PTR 2

**Exhibit 7**

NORDSTROM

Mens_Clothing_Nov11_Schedule.xls | Pay Period 1 - 15

PRINTED ON 10/20/2011

| November DATE | Tuesday 1 | | | Wednesday 2 | | | Thursday 3 | | | Friday 4 | | | Saturday 5 | | | Sunday 6 | | | Monday 7 | | | Tuesday 8 | | | Wednesday 9 | | | Thursday 10 | | | Friday 11 | | | Saturday 12 | | | Sunday 13 | | | Monday 14 | | | Tuesday 15 | | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Store Hours / Events / Goals | 10 - 8 | | | 8 - 10 Womens Half Yearly Sale | | | 10 - 8 | | | 10 - 9 | | | 10 - 9 | | | 11 - 9 Outside Savings | | | 10 - 9 | | | 10 - 8 | | | 10 - 8 | | | 10 - 9 | | | 10 - 8 | | | 10 - 8 | | | 11 - 7 | | | 10 - 9 | | | 10 - 9 | | | |
| NAME | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | I/O | S | NS | |
| Adel | / | | | 2/d | 7.5 | | / | | | 12/8 | 7.0 | | 11/d | 7.5 | | 11.56 | 7.5 | | 1.3/d | 7.0 | | / | | | / | | | 11/8 | 6.0 | | 11.3/d | 8.2 | | 11.3/7 | 6.5 | | 1.3/d | 7.2 | | / | | | 54.0 |
| Mike | 9/d | 4.5 | | / | | | 9/d | 4.5 | | 9/d | 4.5 | | / | | | 10.7 | 8.0 | | 10.5/7 | 7.5 | | / | | | 9/d | 4.5 | | / | | | 9/d | 4.5 | | 9.5/8.2 | 8.0 | | 10.5/6.5 | 7.0 | | / | | | 9/d | 4.5 | | 57.5 |
| Karineh | 12/8 | 7.0 | | 10/8 | 7.0 | | 9.2/5 | 8.5 | | / | | | 9.2/5.5 | 10 | | / | | | 12/8 | 7.5 | | 9.2/5.5 | 7.5 | | / | | | 9/d | 7.5 | | / | | | 9.5/8.3 | 8.0 | | 10.5/7.5 | 8.0 | | 12/8 | 7.0 | | 9.2/6.5 | 7.0 | | 79.5 |
| Nune | 9.2/5.5 | 7.5 | | 11/8 | 7.0 | | 12/8 | 7.0 | | 9.2/5.5 | 10 | | / | | | / | | | 12.3/d | 7.0 | | / | | | / | | | 9.5/9 | 7.5 | | 12/8 | 7.5 | | PTO | | | 12/d | 6.5 | | / | | | / | | | 54.0 |
| | | | | | | | | | | | | | Derbs Now back tonight | | | | | | | | | | | | | | | | | | | | | | | | Heavy! | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Early | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Mid | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Late | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SUPPORT add | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | I/O | | NS | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| MANAGERS add | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | I/O | S | | 0.0 |
| Matt | PTO | | | 7.5/5 | 6.0 | | 9/d | 0.0 | | / | / | | 6/5 | 2.5 | | / | | | 9/5 | 2.0 | | 1/d | 2.0 | | / | | | 8/6 | | | 8/5 | 2.5 | | PTO | | | / | / | | 8/5 | 2.0 | | 9/d | 2.0 | | 0.0 |
| HMCYS Volume | | | | one N/C | | | | | | | | | | | | | | | | | | | | | | | | | 8/9 | | | | | | | | | | | | | | | | | 0.0 |
| Mgmt Volume | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Crew Volume | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ½ InoDec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| LY Volume | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Total Sell Hours | 18.5 | | | 21.5 | | | 19.0 | | | 18.5 | | | 25.5 | | | 22.0 | | | 18.0 | | | 12.1 | | | 15.0 | | | 11.5 | | | 17.5 | | | 24.5 | | | 23.0 | | | 16.0 | | | 11.5 | | | 271.0 |
| Mgmt Sell Hours | 0.0 | | | 6.0 | | | 0.0 | | | 0.0 | | | 2.5 | | | 0.0 | | | 2.0 | | | 2.0 | | | 6.0 | | | 0.0 | | | 2.0 | | | 0.0 | | | 0.0 | | | 2.0 | | | 2.0 | | | 90.5 |
| Crew Sell Hours | 18.5 | | | 21.5 | | | 18.0 | | | 18.5 | | | 23.5 | | | 22.0 | | | 14.0 | | | 11.5 | | | 15.0 | | | 11.5 | | | 15.0 | | | 24.0 | | | 23.0 | | | 14.0 | | | 11.5 | | | 250.0 |
| Support Hours | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 |
| Total NS Hours | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 | | | 0.0 |
| Dept SPH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Mgmt SPH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Crew SPH | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | $275 |
| EARN TYPE | TY Payroll $ | | | TY Hours | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Selling Hours | | | | 259 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Selling OT | | | | | | | LY Hours | | | | | | | | | AVERAGE HOURLY SUPPORT RATE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Support | 0 | | | 0 | | | | | | | | | | | | AVERAGE NON-SELL RATE | | | | | | | | | | | | | | | | | | | | | | | Crew SPH Total Key: | | | | | | | |
| Support OT | | | | | | | | | | | | | | | | PAID HOLIDAY RATE | | | | | | | | | | | | | | | | | | | | | | | Above PTR 2 | | | | | | | |
| Non-Sell | 0 | | | 0 | | | | | | | | | | | | WORKED HOLIDAY RATE | | | | | | | | | | | | | | | | | | | | | | | Within PTR 2 | | | | | | | |
| Commissions | 0 | | | | | | | | | | | | | | | DEPARTMENT COMMISSION % | | | | | | | | | | | | | | | | | | | | | | | Below PTR 2 | | | | | | | |
| Paid Holiday | 0 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Worked Holiday | 0 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | PTR Range | | | | | | | |
| SUB TOTAL | 0 | | | 259 | | | | | | | | | | | | THIS YEAR MID-MONTH SELLING COST | | | | | 0.00% | | | | | | | | | | | | | | | Rating 3 Low | | | $271 | | | |
| Misdraw | | | | | | | | | | | | | | | | Payroll $ Divided by TY Projected Volume | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| GRAND TOTAL | 0 | | | 259 | | | | | | | | | | | | LAST YEAR MID MONTH SELLING COST | | | | | | | | | | | | | | | | | | | | | | | Rating 2 Low | | | $203 | | | |

Service

Teamwork △ Productivity

DEPARTMENT: Men's Clothing

PTR GROUP: Men's Clothing

PAY PERIOD: November 1 - 15, 2011

**Exhibit 7**



**Exhibit 7**