# EXHIBIT 8

# United States District Court
# Central District Of California

GINA BALASANYAN, an individual, and
NUNE NALBANDIAN, an Individual on
behalf of themselves an all others similarly
situated,

                     Plaintiffs,

        vs.

NORDSTROM, INC., a Washington
corporation; DOES 1-100, inclusive,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:    CV-11-05689-DDD- (JCGx)

# CERTIFIED COPY

### DEPOSITION OF
### BLANCA GONZALEZ

Location:

    6310 San Vicente Boulevard, Suite 360
    Los Angeles, California 90048

Date:

    Friday, November 18, 2011 9:29 p.m.

Reporter:

    Willie Anderson, Jr.,
    Certificate Number   13385





HinesReporters.Com,Inc.

International Tower
888 S. Figueroa Street, Suite 840, Los Angeles, CA 90017
Main No. (866) 432-4300, Fax (213) 688-9656

www.hinesreporters.com

**Exhibit 8**

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4

5    GINA BALASANYAN, an         )
     individual, and NUNE        )
6    NALBANDIAN, an              )
     Individual on               )
7    behalf of themselves        )
     and all others              )
8    similarly situated,         )
                                 )
9         Plaintiffs,            )
                                 )
10        vs.                    ) Case No. CV-11-05689-DDD-(JCGx)
                                 )
11   NORDSTROM, INC., a          )
     Washington corporation;)
12   DOES 1-100, inclusive, )
                                 )
13        Defendants.            )
     ─────────────────────────)

14

15

16

17

18

19                   DEPOSITION OF
                   BLANCA GONZALEZ
20

21            Friday, November 18, 2011

22                  9:29 a.m.

23            6310 San Vicente Boulevard
              SUITE 360
24            Los Angeles, California

25

Gina Balasanyan vs. Nordstrom, Inc.                     Deposition of Blanca Gonzalez

1  Deposition of BLANCA GONZALEZ, called as a witness by
2  the Plaintiffs, before WILLIE ANDERSON, JR., Certified
3  Shorthand Reporter Number 13385, for the State of
4  California, with principal office in the County of Los
5  Angeles, commencing at 9:29 a.m., Friday, November 18,
6  2011, at 6310 San Vicente Boulevard, Los Angeles,
7  California.
8                          * * *
9  APPEARANCES:
10
11     FOR THE PLAINTIFFS GINA BALASANYAN AND NUNE
       NALBANDIAN:
12         SCHWARCZ, RIMBERG, BOYD & RADER, LLP
13         BY: SHERLI SHAMTOUB, ESQ.
           6310 San Vicente Boulevard
           Suite 360
14         Los Angeles, California 90048
15         (323) 302-9488 x 209
           sshamtoub@srbr-law.com
16
17  FOR THE DEFENDANTS NORDSTROM, INC.:
18         LAW OFFICES OF LITTLER, MENDELSON
           BY: LARA K. STRAUSS, ESQ.
           501 West Broadway
19         Suite 900
20         San Diego, California 92101-3577
           (619) 232-0441
21
22  APPEARING TELEPHONICALLY:
23     ROSA FRUEHLING-WATSON, ESQ.
24  ALSO PRESENT:
25     Sonseraye Anderson
                                                    Page 2

1                    I N D E X
2
3  Examination                         Page
   By Ms. Shamtoub                        4
4
5          PLAINTIFFS' EXHIBITS
6  1 - A Document Entitled "Update To Dispute    23
       Resolution Program"
7
8  2 - A Document Entitled "Nordstrom Dispute    30
       Resolution Agreement"
9  3 - A Document "Declaration Of Blanca    32
       Gonzalez in Support Of Motion To Compel
10     Arbitration And Stay All Civil Court
       Proceedings," 3 pages
11
12
13
14  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
15          Page          Line
16            (None.)
17
18      INFORMATION REQUESTED
19          Page          Line
20            (None.)
21
22
23
24
25
                                                    Page 3

1                    BLANCA GONZALEZ,
2  called as a witness by and on behalf of the Plaintiffs,
3  having been first duly sworn, was examined and
4  testified as follows:
5
6                      EXAMINATION
7  BY MS. SHAMTOUB:
8      Q.  Good morning.
9      A.  Good morning.
10     Q.  Could you state your name for the record.
11     A.  Blanca Gonzalez.
12     Q.  And can you please state your current address
13  and phone number.
14     A.  7204 Coolgrove Drive Downey, California 90240
15  and phone number -- cell phone number (562) 652-6982.
16     Q.  And Ms. Gonzalez, have you ever been deposed?
17     A.  No.
18     Q.  Okay.  So before we, actually, get to the
19  question portion of the deposition, which is
20  essentially what a deposition is, I'm going to go
21  through some admonitions.  It's the rules of a
22  deposition so you feel comfortable going into the
23  deposition; okay?
24     A.  Okay.
25     Q.  And at any point you have any questions about
                                                    Page 4

1  what I'm saying, please feel free to interrupt me, and
2  I'll clarify something for you; okay?
3      A.  Okay.
4      Q.  So, basically, in a deposition, I'm gonna ask
5  you a series of questions, and you respond with your
6  answers, and your answers are to the best of your
7  knowledge.
8      A.  Okay.
9      Q.  So, essentially, one of the main elements of a
10  deposition is that you should not guess.  So if you
11  don't know the answer to a question, don't guess.
12     A.  Okay.
13     Q.  However, if I ask you to make an estimate,
14  please provide me with an estimate.
15         Now, do you understand the difference between
16  an estimate and a guess?
17     A.  Yes.
18     Q.  For clarification, an estimate would be if I
19  asked you to, you know, look at this table and give me
20  the length and width of this table, you can give me an
21  estimate of that because the table is in front of you.
22     A.  Uh-huh.
23     Q.  If I was to say what was the length and width
24  of the table in the conference room that's adjacent to
25  our office, you wouldn't be able to tell me because you
                                                    Page 5

Exhibit 8   2

Gina Balasanyan vs. Nordstrom, Inc.                          Deposition of Blanca Gonzalez

1 haven't seen that table and, therefore, it would be a
2 guess.
3       So, do you see?
4    A.  Yes.
5    Q.  Okay.  Please also refrain from answering
6 with, you know, any hand expressions or nodding your
7 head or anything like that.  Please, also, make sure
8 that all of your answers are verbal answers.
9    A.  Okay.
10    Q.  And if you don't remember something, please
11 say you don't remember.
12    A.  Okay.
13    Q.  I have the opportunity to come back and ask
14 you questions to try to see if your memory is -- you
15 know, if something comes back to you.
16    A.  Okay.
17    Q.  If something does come back to you later on --
18 if I follow up with you and ask you a question later on
19 and you do remember, I'm entitled to what you remember
20 at that time.
21    A.  Okay.
22    Q.  Okay.  So just because you said you don't
23 remember in the past, don't feel like you can't then
24 answer.
25    A.  Okay.
                                                    Page 6

1    Q.  Sometimes things come back to you; right?
2    A.  Okay.
3    Q.  Now, have you taken any medications today that
4 might impair your ability to provide the best answers?
5    A.  No.
6    Q.  And, also, I'd like to remind you that you are
7 under oath, so anything you say here today has the same
8 force and effect as if you were in a courtroom in front
9 of a judge; okay?
10    A.  Okay.
11    Q.  And during the deposition, the court reporter
12 will be taking down everything that you say.  At the
13 end of the deposition, when the deposition is over,
14 you'll receive a copy of the transcript.
15       At that point, you have an opportunity to
16 review your responses and you'll have the opportunity
17 to correct anything you'd like to correct.
18       Now, keep in mind, if you do make any
19 corrections, we are entitled to then comment on those
20 corrections at a later point; okay?
21    A.  Okay.
22    Q.  So, again, it goes back to please provide the
23 best answers you can, possibly, provide today.  If you
24 don't know something, please say you don't know.  Don't
25 make any guesses, and that's about it.
                                                    Page 7

1    A.  Okay.
2    Q.  Do you have any questions?
3    A.  No.
4    Q.  Now, did you review any documents before
5 coming to the deposition today?
6    A.  No.
7    Q.  Mrs. Gonzalez, what's your current position?
8    A.  I'm the human resources manager for Nordstrom.
9    Q.  And how long have you held this position?
10    A.  Seven and a half months.
11    Q.  Did you work in any other Nordstrom human
12 resources department?
13    A.  No.
14    Q.  Did Nordstrom roll out a new resolution
15 program -- a new Dispute Resolution Program sometime in
16 2011?
17    A.  Yes.
18    Q.  And when was the first time you were informed
19 of the change to the Dispute Resolution Program?
20       MS. STRAUSS:  Objection.  Vague as to time.
21       You can go ahead.
22       THE WITNESS:  I don't remember the exact time
23 it was rolled out.
24 BY MS. SHAMTOUB:
25    Q.  Okay.  Do you know if there was -- in 2011,
                                                    Page 8

1 were there two Dispute Resolution Program roll-outs or
2 were there just -- was there just one?
3    A.  There were -- there were two updates to the
4 program.
5    Q.  Do you recall when the first one was?
6    A.  The first one -- the first one I don't
7 remember the exact time when it was -- when it was
8 rolled out.
9    Q.  Do you recall when the second roll-out was?
10    A.  The second one was, definitely, in the month
11 of August.
12    Q.  Do you recall the differences between the
13 first roll-out and the second roll-out?
14    A.  I don't remember the differences.
15    Q.  Were employees required to acknowledge receipt
16 of the first roll-out?
17    A.  No.
18    Q.  Were you informed of the changes to the first
19 roll-out?  Let me rephrase that.
20       Were you informed of the changes to the
21 Dispute Resolution Program when there was the first
22 roll-out?
23       MS. STRAUSS:  Objection.  Vague.
24       You're talking about the one in 2011?
25       MS. SHAMTOUB:  She said there were two in
                                                    Page 9

**Hines Reporters**

Exhibit 8     **3**

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Blanca Gonzalez

1  2011, and she doesn't know the date to the first one.
2  BY MS. SHAMTOUB:
3      Q.  So when the first roll-out came, were you
4  informed of the changes that were being made to the
5  Dispute Resolution Program, currently, at Nordstrom?
6      A.  I don't remember the exact changes to the
7  first one.
8      Q.  When the second roll-out came through, which
9  was in August, were you at that time informed of the
10  changes that were being made to the Dispute Resolution
11  Program?
12      A.  Yes.
13      Q.  Did you receive any writings reflecting those
14  changes?
15      A.  Yes.
16      Q.  Did you receive any training about the second
17  roll-out?
18      A.  Yes.
19      Q.  Did you receive any training about the first
20  roll-out?
21      A.  I don't know if I would call it training.  I
22  think we were just informed that there was an update.
23      Q.  What, exactly, were you informed about?
24      A.  Just that.  That there was an update to the
25  program.

Page 10

1      Q.  And this was to the first one?
2      A.  Uh-huh.  Yes.
3      Q.  And as to the second one, how were you
4  trained?
5      A.  Through a human resources conference call.
6      Q.  Who was on that conference call?
7      MS. STRAUSS:  Objection.  Calls for
8  speculation.
9      You can answer to the extent you know.
10  BY MS. SHAMTOUB:
11      Q.  I'll clarify it for you.
12      Was it just human resources managers on that
13  conference call?
14      A.  No.
15      MS. STRAUSS:  Same thing.  It calls for
16  speculation.  Sorry.
17      Go ahead and answer.
18      THE WITNESS:  No.
19  BY MS. SHAMTOUB:
20      Q.  Were there managers on that conference call?
21      A.  No.  Well, human -- only -- well, as far as
22  managers, just human resources managers.
23      Q.  Okay.  Was the conference call only specific
24  to the Glendale Galleria Nordstrom?
25      A.  No.

Page 11

1      Q.  Do you know which other Nordstroms it covered?
2      A.  I don't know everybody that was on there but
3  definitely LA and Orange County.
4      Q.  During that conference call, what were you
5  instructed was your role in the roll-out of the Dispute
6  Resolution Program?
7      A.  To provide -- to provide the store with the
8  updated copy.
9      Q.  And how were you supposed to do that?
10      A.  We provide the managers with the updated copy,
11  and the manager -- or department managers then provided
12  the updated copy to their employees.
13      Q.  Was one of your roles to make sure that every
14  employee in the Glendale Galleria Nordstrom signed the
15  Acknowledgement of the receipt of the Dispute
16  Resolution Program?
17      A.  Yes.
18      Q.  Did you keep track of who signed the
19  Acknowledgement of Receipt?
20      A.  Yes.
21      Q.  Did you keep track of who didn't sign the
22  Acknowledgement of Receipt?
23      A.  Yes.
24      Q.  Do you know how many employees of Glendale
25  Galleria didn't sign the Acknowledgement of Receipt?

Page 12

1      MS. STRAUSS:  Objection.  Vague.
2      You can go ahead.
3      THE WITNESS:  Two.
4  BY MS. SHAMTOUB:
5      Q.  Were you given any goals in the training?
6      A.  Any goals?
7      Q.  Uh-huh.
8      A.  No.
9      Q.  For instance, were you -- were you told that
10  the -- were you given a timeframe, like an optimal
11  timeframe, to get the signatures from the employees --
12  the Acknowledgements from the employees?
13      A.  No.  I don't remember there being, like, a
14  timeframe.
15      Q.  Were you instructed what to do if somebody
16  didn't sign the Acknowledgement form?
17      A.  Yes.
18      Q.  What were you instructed to do?
19      A.  For the manager -- whoever the person was that
20  delivered the -- that gave the employee the updated
21  copy, to write that -- that they did give the employee
22  the updated copy on the Acknowledgement form.
23      Q.  Were you, also, supposed to indicate that the
24  employee refused to sign the Acknowledgement?
25      MS. STRAUSS:  Can you read that one back,

Page 13

**Hines Reporters**

Exhibit 8                4

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Blanca Gonzalez

1  please.
2          (The record was read by the Court
3      Reporter as follows:
4      "Q.  Were you, also, supposed to
5      indicate that the employee refused to
6      sign the Acknowledgement?")
7      MS. STRAUSS:  You can go ahead.
8      THE WITNESS:  No.  I don't believe so.
9  BY MS. SHAMTOUB:
10     Q.  Do you know, on those two Acknowledgements
11 that you received that you indicated before that were
12 not signed, whether it was indicated that the employee
13 refused to sign the Acknowledgement?
14     A.  No.
15     Q.  "No," you don't recall or "No," there was no
16 indication?
17     A.  No, there was no indication that they refused.
18     Q.  Were you instructed to make any statements to
19 the employee if they refused to sign the
20 Acknowledgement?
21     A.  Just to -- just letting them know that we
22 would be writing down that we gave them the program on
23 the Acknowledgement form.
24     Q.  Were you instructed to let them know that this
25 was simply an Acknowledgement of Receipt?
                                                   Page 14

1      A.  Yes.
2      Q.  Were you, also, required to let them know that
3  this wasn't an agreement?
4      MS. STRAUSS:  I'm sorry.
5      Can you repeat that.
6      MS. SHAMTOUB:  Yeah.  That it wasn't an
7  agreement; that it was just an Acknowledgement of
8  Receipt.
9      MS. STRAUSS:  Did you say it was or wasn't?
10     MS. SHAMTOUB:  Was not -- was not an
11 agreement.
12     THE WITNESS:  Yes.  We were instructed to let
13 them know that it was only an Acknowledgement of
14 Receipt, the actual, form that they would be signing.
15 BY MS. SHAMTOUB:
16     Q.  Were you aware of the effect on the employee
17 if they refused to sign the Acknowledgement?
18     A.  No.
19     Q.  Was there any effect on the employee if they
20 refused to sign the Acknowledgement?
21     A.  No.
22     Q.  Were any employees written up for refusing to
23 sign the Acknowledgement?
24     A.  No.
25     Q.  Were you instructed what to do if somebody
                                                   Page 15

1  requested an opportunity to review the Dispute
2  Resolution Program prior to signing the
3  Acknowledgement?
4      A.  Can you repeat the question.
5      Q.  Were you instructed what to do if somebody
6  requested an opportunity to review the Dispute
7  Resolution Program prior to signing the
8  Acknowledgement?
9      A.  Yes.
10     Q.  And what were you instructed to do?
11     A.  To ask them at that time if they had any
12 questions about the program.  But, again, the
13 Acknowledgement was just an Acknowledgement of Receipt.
14     So even if they wanted to take it and review
15 it, we were still going to write that we gave them the
16 program because we did.
17     Q.  Were you given any instructions about the
18 effect of the Dispute Resolution Program on individuals
19 who are currently involved in litigation?
20     A.  No.
21     Q.  Were you given any instructions about what to
22 say to employees who were litigating -- so no
23 instructions about employees -- sorry.
24     No instructions about employees that were
25 currently involved in litigation; correct?
                                                   Page 16

1      A.  No.
2      Q.  Were you given any instructions about the
3  effect of signing the Acknowledgement?
4      MS. STRAUSS:  Objection.  Vague.
5      THE WITNESS:  No.
6  BY MS. SHAMTOUB:
7      Q.  Other than being told that the Acknowledgement
8  meant that the Dispute Resolution was received by the
9  employee, were you given any indication of what it
10 meant to sign the Dispute Resolution Program?
11     A.  No.
12     Q.  Employees who signed the dispute -- the
13 Acknowledgement to the Dispute Resolution Program, were
14 they given any increases in wages?
15     A.  No.
16     Q.  Were they given any perks?
17     A.  No.
18     Q.  For instance, additional time off?
19     A.  No.
20     Q.  Reduced hours?
21     A.  No.
22     Q.  Any additional discounts for purchases?
23     A.  No.
24     Q.  Were employees who refused to sign the
25 Acknowledgement -- did they receive any disincentive
                                                   Page 17

**Hines Reporters**

Exhibit 8    5

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Blanca Gonzalez

1  for refusing to sign the Acknowledgements?
2      A.  And we didn't have anyone that refused.  Just
3  to clarify your -- the way you put your question, we
4  had two employees that didn't sign it but no indication
5  that they refused -- that there was a refusal to sign
6  it.
7      Q.  Okay.  Did any employees make any changes to
8  the Dispute Resolution Program?
9          MS. STRAUSS:  Calls for speculation.
10         THE WITNESS:  Repeat that.
11 BY MS. SHAMTOUB:
12     Q.  Could employees make any changes to the
13 Dispute Resolution Program?
14         MS. STRAUSS:  Objection.  Calls for
15 speculation.  Lacks foundation.
16         You can go ahead.
17         THE WITNESS:  No.
18 BY MS. SHAMTOUB:
19     Q.  Were you instructed that they could make
20 changes?
21     A.  No.
22     Q.  Were you instructed that they could not make
23 changes?
24     A.  When you say -- what do you mean when you ask
25 "changes"?  To the actual program itself?

Page 18

1      Q.  Yeah.  Make any changes to the face of the
2  document?
3      A.  No.  No.  Not that I -- no.
4      Q.  So after you attended the conference call
5  training, were you then required to train the managers?
6      A.  Yes.
7      Q.  And how did you train the managers?
8      A.  Through a department manager meeting.
9      Q.  And how many managers were present?
10     A.  I don't remember an exact number.
11     Q.  Was Mr. Matthew Bodaken present?
12     A.  Yes.
13     Q.  And what was the content of the training?
14     A.  Can you be a little more specific.
15     Q.  What did you train them on, exactly?
16     A.  Just how they were to roll it out to their --
17 to their managers, to their team.
18     Q.  Did you cover all the points that you received
19 on your conference call?
20     A.  Yes.
21     Q.  Was there anything -- any instructions that
22 you received that you did not then tell the managers?
23     A.  No.
24     Q.  So do you recall, exactly, what were the
25 points that you said to the managers regarding the

Page 19

1  roll-out of the Dispute Resolution Program?
2      A.  I don't remember word by word of all the
3  points that we -- that I talked about that day.
4      Q.  Did you have specific talking points?
5      A.  Uh-huh.  Yes.
6      Q.  Did you inform them of the effect of signing
7  the Acknowledgement?
8          MS. STRAUSS:  Objection.
9          THE WITNESS:  No.
10         MS. STRAUSS:  Vague.  You can go ahead.
11 Sorry.
12         THE WITNESS:  No.
13 BY MS. SHAMTOUB:
14     Q.  Did you inform them what to do in the event
15 that an employee refused to sign the Acknowledgement?
16     A.  Yes.
17     Q.  And what did you inform them to do?
18     A.  To let their employees know that it was simply
19 an Acknowledgement and to write on the Acknowledgement
20 form that they did provide a copy of the update to the
21 program.
22     Q.  Did you inform them to write that the employee
23 refused to sign the Acknowledgement form?
24     A.  No.
25     Q.  So who was supposed to hand the employees the

Page 20

1  new Dispute Resolution Program?
2      A.  Their department manager.
3      Q.  And were the department managers required to
4  talk to the employees at the time that they handed them
5  the new Dispute Resolution Program?
6      A.  Yes.
7      Q.  And what were they required to say to the
8  employees?
9      A.  There were talking points on what to say to
10 their employees about the program.
11     Q.  And do you recall what those talking points
12 were?
13     A.  Not -- not word by word, I don't.  Not each
14 one.
15     Q.  Do you remember any of them?
16     A.  Just the -- that the Acknowledgement was just
17 Acknowledgement of Receipt and that there were updates
18 to the -- to the Nordstrom Dispute Resolution Program.
19     Q.  Did they go and -- did they talk about them --
20 did they talk to the employees about the specific
21 updates to the Dispute Resolution Program?
22         MS. STRAUSS:  Objection.  Lacks foundation and
23 calls for speculation.  She wasn't there for the
24 conversation --
25 ///

Page 21

**Hines Reporters**

Exhibit 8      6

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Blanca Gonzalez

1   BY MS. SHAMTOUB:
2       Q.  Were they instructed --
3           MS. STRAUSS:  -- they had with --
4           MS. SHAMTOUB:  Sorry.
5   BY MS. SHAMTOUB:
6       Q.  Were they instructed to speak to the
7   attorney -- to speak to the employees about the
8   specific changes to the Dispute Resolution Program?
9       A.  There were -- I'd have to see the talking
10  points, but whatever was on the talking points is what
11  they were instructed to talk to them about.
12          And there were -- there were talking points in
13  regards to what was updated, but I don't recall right
14  now, exactly, what that said on the talking points.
15      Q.  Did any of the managers express that they did
16  not understand their role in the roll-out of the
17  Dispute Resolution Program?
18      A.  No.
19      Q.  And how many department managers are in your
20  location?
21      A.  An estimate, we have about 25 managers.
22      Q.  And did you train all of them?
23      A.  They're not -- not every single manager within
24  the meeting.  In the meeting, but afterwards we did
25  train every- -- we did -- we did talk to any manager
                                                    Page 22

1   that was not at the meeting.
2       Q.  And who's Ms. Nalbandian's manager?
3       A.  Matt Bodaken.
4           MS. SHAMTOUB:  Can we just take a one-minute
5   break?
6           MS. STRAUSS:  Sure.
7           (Whereupon a brief recess was held.)
8           MS. SHAMTOUB:  Okay.  Let's mark as Exhibit 1.
9           (Plaintiffs' Exhibit 1 was marked for
10          identification by the Court Reporter,
11          and a copy is attached hereto.)
12  BY MS. SHAMTOUB:
13      Q.  Do you want -- just make sure, after you
14  review this document, to set it on the side for the
15  court reporter.
16      A.  Okay.
17      Q.  So, do you recognize this document?
18      A.  Yes.
19      Q.  Can you describe this document?
20      A.  This is the talking points.  Well, this was --
21  this was the talking points for the managers, but this
22  is a second one that came out after I had already given
23  the managers the original talking points.
24      Q.  Do you know what the differences is between
25  this document and the first one?
                                                    Page 23

1       A.  Just looks like the picture and then a
2   little -- and just more information on what to write on
3   the document if someone, you know, decided not to --
4   not to sign the Acknowledgement.
5       Q.  Okay.  So does this document, adequately,
6   reflect what the managers were required to tell their
7   employees in the event an employee didn't sign the
8   document?
9       A.  I'll just read the talking points.
10      Q.  Sure.
11      A.  Yes.
12      Q.  Were the managers required to, also, sign the
13  Acknowledgement form?
14      A.  No.
15      Q.  Aside from these talking points, were the
16  managers forbidden from giving further detail about the
17  Dispute Resolution Program?
18      A.  That's not -- no, not forbidden.
19      Q.  Did you feel fairly comfortable with the
20  contents of the Dispute Resolution Program?
21      A.  Yes.
22      Q.  So if an employee had questions about the
23  contents, would you be able to answer the questions?
24      A.  I would say yes.
25      Q.  Did you have any employees ask you about the
                                                    Page 24

1   effect of the Dispute Resolution Program on them?
2       A.  No.
3       Q.  And in the instance of Ms. Nalbandian, did
4   Mr. Bodaken hand Ms. Nalbandian the Dispute Resolution
5   Program?
6           MS. STRAUSS:  Objection.  Calls for
7   speculation.  Lacks foundation.
8           THE WITNESS:  He did not.
9   BY MS. SHAMTOUB:
10      Q.  Did you hand Ms. Nalbandian the Dispute
11  Resolution Program?
12      A.  Yes.
13      Q.  Why -- as you said before, typically it was
14  the store managers -- the department managers that were
15  supposed to hand out the Dispute Resolution Program;
16  correct?
17      A.  Correct.
18      Q.  And in this instance, why didn't Mr. Bodaken
19  do that?
20      A.  I don't know.
21      Q.  Had you instructed him to hand the Dispute
22  Resolution Program out to Ms. Nalbandian?
23      A.  Yes.
24      Q.  Did he indicate to you that he would not?
25      A.  No.
                                                    Page 25

**Hines Reporters**

Exhibit 8                    7

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Blanca Gonzalez

1    Q. So how did it come to be that you handed her
2 the Dispute Resolution Program?
3    A. I don't know.
4      MS. STRAUSS: Object that it calls for
5 speculation and lacks foundation. She only knows her
6 piece of it.
7      You can go ahead and answer.
8      THE WITNESS: I don't know. She came to our
9 office.
10 BY MS. SHAMTOUB:
11    Q. And do you recall when it is that you gave
12 Ms. Nalbandian the Dispute Resolution Program?
13    A. I believe it was September 30th.
14    Q. And when was the Dispute Resolution Program
15 supposed to be handed out to employees?
16    A. The initial roll-out to managers was in the
17 month of August.
18    Q. And why did Ms. Nalbandian receive the Dispute
19 Resolution Program in September?
20    A. She was on a leave of absence during that
21 time.
22    Q. Do you recall when she took her leave of
23 absence?
24    A. I don't recall the exact dates, but she was
25 definitely -- she was -- definitely in the month of

Page 26

1 August, she was not present.
2    Q. Do you recall when she came back from her
3 leave of absence?
4    A. Mid-September.
5    Q. From the date that she came back to the date
6 that she came to your office and you handed her the
7 Dispute Resolution Program, did you speak with
8 Mr. Bodaken regarding Ms. Nalbandian's Acknowledgement
9 of Receipt of the Dispute Resolution Program?
10    A. Yes.
11    Q. And what was the context of your conversation?
12    A. That I did not have her Acknowledgement form
13 back.
14    Q. And what was Mr. Bodaken's response to you?
15    A. That he would go over the talking points with
16 her.
17    Q. To the best of your knowledge, do you know if
18 Mr. Bodaken did go over the talking points with her?
19    A. I don't know.
20      MS. STRAUSS: Calls for speculation. Lacks
21 foundation.
22      I'm sorry.
23      THE WITNESS: I don't know.
24 BY MS. SHAMTOUB:
25    Q. Did you ask Ms. Nalbandian to come into your

Page 27

1 office to sign the Acknowledgement of Receipt of the
2 Dispute Resolution Program?
3    A. No.
4    Q. Do you know who asked her to come into your
5 office?
6    A. I don't know. I can only assume it was
7 Mr. Bodaken.
8    Q. Did you ask Mr. Bodaken to have her come into
9 your office?
10    A. No.
11    Q. When Ms. Nalbandian did come into your office,
12 did she request to have an opportunity to review the
13 document prior to signing it?
14    A. Yes.
15    Q. Did you give her that opportunity?
16    A. Yes.
17    Q. Did she feel, adequately, informed of the
18 contents of the -- did she express to you that she
19 felt, adequately, informed of the contents of the
20 Dispute Resolution Program?
21      MS. STRAUSS: Objection. Vague.
22      You can go ahead.
23      THE WITNESS: She didn't say those words.
24 BY MS. SHAMTOUB:
25    Q. What did she say to you?

Page 28

1    A. About the program? What do you mean, "What
2 did she say," specifically?
3    Q. About the Dispute Resolution Program.
4    A. That she was familiar with the program.
5    Q. So then why did she ask you for an opportunity
6 to review it prior to giving you the acknowledge --
7 signing the Acknowledgement of Receipt?
8    A. I don't know.
9    Q. Did she refused to sign the Acknowledgement of
10 Receipt?
11    A. No.
12    Q. Did you inform her of the effect of signing
13 the Acknowledgement of Receipt?
14    A. No.
15    Q. Do you know -- did you go through the talking
16 points that you -- that you were instructed to go
17 through in the event that an employee refused to sign
18 the Acknowledgement of Receipt?
19    A. Some.
20    Q. Do you know which talking points you went
21 through?
22    A. I went over reminding her of the mailing she
23 would have received back in June and that we wanted to
24 provide her with an updated program.
25      And those are the only two I remember being

Page 29

Gina Balasanyan vs. Nordstrom, Inc.                    **Deposition of Blanca Gonzalez**

1  able to talk to her about.
2      Q.  The mailing in June, are you referring to the
3  first roll-out?
4      A.  Mailing in June would have been the -- yeah,
5  the first roll-out.
6      Q.  And do you know if the contents of the first
7  roll-out were the same as the contents of the second?
8      A.  I don't know.
9          MS. SHAMTOUB:  Let's mark as Exhibit 2.
10         (Plaintiffs' Exhibit 2 was marked for
11         identification by the Court Reporter,
12         and a copy is attached hereto.)
13  BY MS. SHAMTOUB:
14     Q.  Do you recognize this document?
15     A.  Yes.
16     Q.  Describe what this document is.
17     A.  It's the Acknowledgement form.
18     Q.  Below, is that your signature on that line?
19     A.  That's my signature.
20     Q.  Okay.  So below your signature, can you -- do
21  you see the statement that's in handwriting?
22     A.  Yes.
23     Q.  And in that statement -- did you write this
24  statement?
25     A.  I did.

                                                Page 30

1      Q.  And in that statement you state that
2  Ms. Nalbandian refused to sign this Acknowledgement?
3      A.  Yes.
4      Q.  Previously, you had stated that she did not
5  refuse to sign this Acknowledgement?
6          MS. STRAUSS:  Mischaracterizes the testimony.
7          Go ahead.
8          THE WITNESS:  She did refuse to sign the
9  Acknowledgement at that time.  She said she wanted to
10 read it over, but she wasn't refusing to sign the
11 agree- -- she refused to sign to agree to the program.
12         And I explained to her that it was just the
13 Acknowledgement -- an Acknowledgement of Receipt.  So
14 she did refuse to sign the Acknowledgement of receiving
15 the document.  She took it with her.
16 BY MS. SHAMTOUB:
17     Q.  I'm sorry.  Can you repeat that.  I didn't
18 quite understand.
19     A.  Which part?
20     Q.  From the beginning.
21     A.  She refused -- she did refuse to sign the
22 Acknowledgement.  She wanted to take it with her, and I
23 explained to her that it was just an Acknowledgement
24 and that she needed to sign for the fact that we did
25 provide her with a copy.  So that's why that says that.

                                                Page 31

1      Q.  But she -- did you say that she refused the --
2  the Dispute Resolution Program?
3      A.  She didn't want to sign to the program (sic),
4  and I explained to her, that's not what this signature
5  was for.
6      Q.  Okay.  And did she give you any reason for
7  refusing to sign on to the program?
8      A.  No.
9      Q.  Did she give any reason for refusing to sign
10 that Acknowledgement itself?
11     A.  No.
12         MS. SHAMTOUB:  Okay.  Let's mark as Exhibit 3.
13         (Plaintiffs' Exhibit 3 was marked for
14         identification by the Court Reporter,
15         and a copy is attached hereto.)
16 BY MS. SHAMTOUB:
17     Q.  Ms. Gonzalez, do you recognize this document?
18 Maybe you can flip it over to the second page.
19     A.  Yes.
20     Q.  Can you describe this document?
21     A.  It was a declaration.
22     Q.  Did you prepare the declaration?
23     A.  No.
24     Q.  Did you review the contents of the declaration
25 prior to signing it?

                                                Page 32

1      A.  Yes.
2      Q.  And were the contents of the declaration an
3  accurate description of what you believe to be true?
4      A.  Yes.
5      Q.  In Paragraph 5 starting at the bottom of Page
6  1 and going over to Page 2.  On Page 2, in particular,
7  you state -- second line down -- when you began to
8  review the August 2011 Nordstrom Dispute Resolution
9  Agreement with Ms. Nalbandian, "She told me that she
10 had already received the copy of the 2011 Nordstrom
11 Dispute Resolution Program that was attached to her
12 September 19th pay stub and thus indicated that she was
13 already familiar with it"; is that correct?
14     A.  Correct.
15     Q.  Now, again, just to clarify, Ms. Nalbandian,
16 however, still asked you for an opportunity to review
17 the document; isn't that correct?
18     A.  Yes.
19     Q.  And she still refused to sign the
20 Acknowledgement; correct?
21         MS. STRAUSS:  Objection.  Mischaracterizes the
22 testimony.
23         You can go ahead.
24         THE WITNESS:  She did not want to sign the
25 Acknowledgement form.

                                                Page 33

Gina Balasanyan vs. Nordstrom, Inc.                                     Deposition of Blanca Gonzalez

BY MS. SHAMTOUB:
Q. And why didn't you include that in your declaration?
A. I don't know.
Q. Prior to taking disability leave, did Ms. Nalbandian speak to you about her -- her assigned hours?
A. No.
Q. Did she come to ask you that she wanted to make sure that taking disability leave wouldn't, otherwise, impact the number of hours she was assigned per pay period?
MS. STRAUSS: I'm sorry. Can you read that back.
(The record was read by the Court Reporter as follows:
"Q. Did she come to ask you that she wanted to make sure that taking disability leave wouldn't, otherwise, impact the number of hours she was assigned per pay period?")
THE WITNESS: No.
BY MS. SHAMTOUB:
Q. Upon her return.
A. No.

Page 34

Q. Does Nordstrom have a policy regarding assignment of hours to commission-based employees?
A. What do you mean by "policy"?
Q. Is there a particular company-wide rule that everybody has to follow in terms of how to assign hours to a commission-based employee?
A. Yes.
Q. And do you know what that rule is?
A. It's based on -- we give hours based on ranking in the schedule.
Q. I'm sorry. Can you repeat that.
A. Hours are distributed based on ranking on the schedule.
Q. And how is one ranked on the schedule?
A. It's based on performance, on productivity, service and team.
Q. And what makes up performance?
A. Say that again.
Q. What makes up the criteria for performance?
A. The three that I just stated -- service, team and productivity -- is how we measure overall performance.
Q. Oh, I see.
And what makes up productivity?
A. The sales per hour.

Page 35

Q. Anything else?
A. No. That would be the -- what we look at for productivity.
Q. And what about team?
A. Team: It's kind of a -- there's a lot of things that fall under team -- working scheduled shifts, routine relationships, just overall teamwork.
Q. Who ranks the team aspect?
A. It's not ranked on its own. It's the three combined.
Q. Who would give the score for somebody's team performance?
A. Their department manager.
Q. And would the department manager give the score for the productivity as well as the service?
A. Uh-huh. Yes.
Q. And what makes up service?
A. Interactions with the customer, return clientele -- a number of things: Being productive in customer -- in customer situations. Those are a couple.
Q. And how often is -- are each employee -- are employees evaluated for their performance?
A. For what purpose? For the ranking or you're just saying overall?

Page 36

Q. Yes.
A. For the ranking purposes it's as needed.
Q. Can you give me a bit more parameters for "as needed."
Do you have specific timeframes -- quarterly timeframes, for instance, for the managers to provide ranking?
A. There's no specific timeframe. It would -- it would just depend on them -- if some employees are showing significant results, either way, in their performance, would call for reranking of schedule.
Q. And who makes a determination of whether or not the schedule requires reranking?
A. The department manager.
Q. Does the department manager need to run that by anybody else prior to making that determination?
A. Normally, the department manager would talk to HR or their store manager in regards to possibly -- in regards to, possibly, reranking the schedule.
Q. And in -- do you know, for Mr. Bodaken, whether he had recently done a reranking for any of his employees?
A. Not to my knowledge, no.
Q. Is there a minimum number of hours assigned for full-time employees -- commission-based employees?

Page 37

**Hines Reporters**

Exhibit 8   10

Gina Balasanyan vs. Nordstrom, Inc.                         **Deposition of Blanca Gonzalez**

| | |
|---|---|
| 1   A. Can you repeat the question. | 1   A. I am now. |
| 2   Q. Is there a minimum of hours to be assigned to | 2   Q. How were you informed? |
| 3 full-time commissioned-based employees? | 3     MS. STRAUSS: I would just caution the witness |
| 4     MS. STRAUSS: Calls for speculation. Lacks | 4 not to share any communications with Counsel. |
| 5 foundation. | 5     You can ask her if she has knowledge of that |
| 6     You can go ahead. | 6 outside of any communication with Counsel. |
| 7     THE WITNESS: No. | 7 BY MS. SHAMTOUB: |
| 8 BY MS. SHAMTOUB: | 8   Q. Outside of communication with Counsel? |
| 9   Q. Does Nordstrom have a policy that says, for | 9   A. No. |
| 10 instance, if you're a full-time employee, you're | 10   Q. Did you instruct Mr. Bodaken to increase |
| 11 entitled to 40 hours per week? | 11 Ms. Nalbandian's hours -- |
| 12   A. No. | 12   A. No. |
| 13   Q. Are full-time employees given less than | 13   Q. -- following her return from disability leave? |
| 14 40 hours per week? | 14   A. No. |
| 15   A. We don't, really, call employees full-time | 15   Q. Have you communicated Ms. Nalbandian's |
| 16 employees. We just -- we schedule the business. So | 16 reduction of hours with Mr. Bodaken? |
| 17 the hours often vary. | 17   A. No. |
| 18     So there's no, like, set full-time employee | 18   Q. Did Mr. Bodaken speak to you about the |
| 19 but -- so I guess -- yeah. I guess that's the only way | 19 reduction of hours? |
| 20 I can answer that question. | 20     MS. STRAUSS: Objection. Calls for |
| 21   Q. So you -- you don't have a distinction between | 21 speculation. Assumes facts not in evidence. |
| 22 full-time and part-time employees? | 22     You haven't even established that there's a |
| 23   A. The hours vary. So a full-time employee | 23 reduction of hours that she's aware of. |
| 24 normally -- someone who normally works 37 and a half | 24     You can go ahead. |
| 25 hours, we would consider to be working full time. | 25     THE WITNESS: No. |
| Page 38 | Page 40 |
| 1   Q. And what would be the designation for a person | 1 BY MS. SHAMTOUB: |
| 2 who is part time? How many hours per week? | 2   Q. When an employee takes disability leave and |
| 3   A. Anything under 30 we would consider part time. | 3 they return, does Nordstrom guarantee that their hours |
| 4   Q. So the number of hours assigned to any | 4 will remain the same? |
| 5 employee -- any commission-based employee is then based | 5   A. No. |
| 6 on their ranking; is that correct? | 6   Q. What's the policy when an employee takes |
| 7     MS. STRAUSS: Objection. Mischaracterizes the | 7 disability leave? |
| 8 testimony. | 8   A. We guarantee the ranking to stay the same |
| 9     You can go ahead and answer. | 9 while they're on the leave. |
| 10     THE WITNESS: Can you repeat the question. | 10   Q. Okay. And correct me if I'm wrong, but the |
| 11 BY MS. SHAMTOUB: | 11 ranking directly affects the number of hours the person |
| 12   Q. The number of hours assigned to any | 12 is assigned per pay period; correct? |
| 13 employee -- commissioned-based employee is based on | 13   A. Correct. |
| 14 their ranking; is that correct? | 14   Q. So then, when somebody returns from disability |
| 15   A. Yes. | 15 leave, if their ranking remains the same, then their |
| 16   Q. Are there any other factors other than the | 16 hours should remain the same as prior to them taking |
| 17 ranking? | 17 off for disability leave? |
| 18   A. Just any -- it depends on the employee's | 18     MS. STRAUSS: Objection. That |
| 19 request as well. | 19 mischaracterizes the testimony. She identified a |
| 20   Q. So if an employee requested for more hours, | 20 number of other factors. |
| 21 then the managers can take that into consideration? | 21     You can go ahead. |
| 22   A. Yes, of course. | 22     THE WITNESS: No. |
| 23   Q. So are you aware that Ms. Nalbandian's hours | 23 BY MS. SHAMTOUB: |
| 24 were reduced following her return from disability | 24   Q. Can you describe the circumstances where it |
| 25 leave? | 25 wouldn't remain the same? |
| Page 39 | Page 41 |

**Hines Reporters**

Exhibit 8   11

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Blanca Gonzalez

1  A.  Business.  We -- if -- you know, the months
2  are different according to business.  So if she was
3  gone in August and back in September, our staffing may
4  look different in September due to business.
5  Q.  Okay.  How does business affect your staffing?
6  A.  We staff according to business so the hours
7  are -- we give -- we give the amount of hours per
8  department according to the business of that department
9  or the business in the store.  Those hours are then
10 divvied up according to ranking.
11 Q.  What's -- I see.
12    So what department is Mr. Bodaken in?
13 A.  Men's clothing.
14 Q.  And how was the business in the men's clothing
15 in August, if you recall?
16 A.  I don't remember.
17 Q.  Do you recall a sharp decrease in business in
18 the men's department in September?
19 A.  I don't remember.
20 Q.  Do you have -- is August, typically, thought
21 of as being a more productive time of the year?
22    MS. STRAUSS:  Objection.  Vague.
23    You can go ahead.
24 BY MS. SHAMTOUB:
25 Q.  Are sales, typically, higher in August than

Page 42

1  they are in September?
2    MS. STRAUSS:  Objection.  Lacks foundation.
3  Calls for speculation.
4    THE WITNESS:  It's hard to answer.  It just
5  depends.
6  BY MS. SHAMTOUB:
7  Q.  Now, when business affects staffing, does the
8  HR department first learn of the business trend and
9  then communicate that to the -- to the managers?
10 A.  Yes.
11 Q.  And how far in advance are you made aware of,
12 you know, the hours to be assigned to a particular
13 department?
14 A.  About a month.  Prior to that month.
15 Q.  And do you know the number of hours that the
16 business -- I'm sorry -- that the men's department is
17 assigned in -- in September?  Do you know that?
18 A.  No, I don't know.
19 Q.  Do you know the number of hours that they're
20 assigned in November?
21 A.  No.  Not from the top of my head, no.
22 Q.  When you communicate the number of hours
23 assigned to each department to the manager, do you,
24 also, give them any guidelines about how to distribute
25 these hours?

Page 43

1  A.  No.
2  Q.  Is that all within the purview of the manager?
3  A.  It's understood that it's according to
4  ranking.
5    MS. SHAMTOUB:  I'm pretty much down.
6    So if you have --
7    MS. STRAUSS:  Can we take a quick break.
8    MS. SHAMTOUB:  Sure.
9    (Whereupon a brief recess was held.)
10   MS. STRAUSS:  I think there's something the
11 witness wanted to clarify.
12   MS. SHAMTOUB:  Okay.  Go ahead.
13   THE WITNESS:  I wanted to clarify from -- as
14 far as the refusal of Nune signing the Acknowledgement
15 form, I just wanted to clarify from your question in
16 the beginning.
17   I don't think I understood it right, but Nune
18 only refused to sign the Acknowledgement form at that
19 moment.  She never refused or told me she refused to be
20 a part of the actual program, which is what I thought
21 you were asking me in the beginning.
22   She never said she didn't want to be -- the
23 program to apply to her.  She just didn't want to sign,
24 at that moment, the Acknowledgement of Receipt.
25   So I just wanted to clarify that because I

Page 44

1  don't think -- I think I got confused in the
2  beginning --
3    MS. SHAMTOUB:  Okay.
4    THE WITNESS:  -- on that question.
5    MS. SHAMTOUB:  Lara, do you have any
6  questions?
7    MS. STRAUSS:  I don't have any questions.
8    MS. SHAMTOUB:  Okay.  So that's the end of the
9  deposition.
10   THE WITNESS:  Okay.
11   MS. SHAMTOUB:  I'll just go through the last
12 part.  Do you think 15 days would be sufficient for you
13 to review the document and make any changes to it?
14 It's gonna be quite small.
15   THE WITNESS:  Yes.
16   MS. SHAMTOUB:  So we'll have the document --
17 the transcript sent to Lara's office, and then she can
18 send that over to you.
19   You'll have 15 days to review it.  Thereafter,
20 if we don't receive any notification of changes to the
21 transcript, we'll assume that the transcript, as it is,
22 is the correct form, and that there are no changes to
23 it; okay?
24   THE WITNESS:  Okay.
25   MS. STRAUSS:  And you don't, actually, need to

Page 45

Exhibit 8    12

Gina Balasanyan vs. Nordstrom, Inc.                    **Deposition of Blanca Gonzalez**

| | |
|---|---|
| 1 worry about that. I will stipulate to that that you | 1     I certify or declare under |
| 2 can have -- the original of the deposition transcript | 2 declaration under penalty of perjury |
| 3 will be sent to my office? | 3 that the foregoing testimony is true |
| 4     MS. SHAMTOUB: Right. | 4 and correct. |
| 5     MS. STRAUSS: Is that correct? | 5 |
| 6     MS. SHAMTOUB: Yes. | 6     Executed this ____ day of |
| 7     MS. STRAUSS: And then we are reserving -- | 7 _____, |
| 8 because we are in federal court -- the opportunity for | 8 2011, at _____, |
| 9 the witness to make changes. So we'll follow that | 9 California. |
| 10 process, and then will we keep the original of the | 10 |
| 11 transcript? | 11 |
| 12     MS. SHAMTOUB: Yes. | 12 |
| 13     MS. STRAUSS: Okay. So we'll keep the | 13 |
| 14 original of the transcript. The signature page and any | 14 |
| 15 changes to it will be sent to opposing counsel's office | 15     ―――――――― BLANCA GONZALEZ ―――――――― |
| 16 within five days of receipt. And if for any reason we | 16 |
| 17 need something longer than the 15 days for some reason, | 17 |
| 18 in light of the holidays, then we'll contact your | 18 |
| 19 office. | 19 |
| 20     MS. SHAMTOUB: Okay. Not a problem. And if | 20 |
| 21 the original is lost or otherwise unavailable, a | 21 |
| 22 certified copy can be used in lieu of the original at | 22 |
| 23 the time of trial. | 23 |
| 24     MS. STRAUSS: So stipulated. | 24 |
| 25     MS. SHAMTOUB: And so we stipulate to relieve | 25 |
| Page 46 | Page 48 |
| 1 the court reporter of his duties and that will conclude | 1 STATE OF CALIFORNIA     ) |
| 2 our deposition. | 2 COUNTY OF LOS ANGELES   ) ss. |
| 3     MS. STRAUSS: And can we just relieve the | 3 |
| 4 court reporter of his duties with respect to retention | 4     I, WILLIE ANDERSON, JR., Certified Shorthand |
| 5 of the transcript, but not with respect to other | 5 Reporter qualified in and for the State of California, |
| 6 duties, I think. | 6 do hereby certify: |
| 7     MS. SHAMTOUB: Certainly. Yes. | 7     That the foregoing transcript is a true and |
| 8     (Whereupon, the proceedings recessed at | 8 correct transcription of my original stenographic |
| 9     the hour of 10:32 a.m.) | 9 notes. |
| 10 | 10     I further certify that I am neither attorney or |
| 11 | 11 counsel for nor related to or employed by any of the |
| 12 | 12 parties to the action in which this proceeding was |
| 13 | 13 taken; and furthermore, that I am not a relative or |
| 14 | 14 employee of any attorney or counsel employed by the |
| 15 | 15 parties hereto or financially interested in the action. |
| 16 | 16     IN WITNESS WHEREOF, I have hereunto set my hand |
| 17 | 17 this _____ day of _____, 2011. |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22     _____ |
| 23 | 23     WILLIE ANDERSON, JR. |
| 24 | 24     CSR No. 13385 |
| 25 | 25 |
| Page 47 | Page 49 |

**Hines Reporters**

Exhibit 8   13

Gina Balasanyan vs. Nordstrom, Inc.                    Deposition of Blanca Gonzalez

```
 1              I certify or declare under
 2        declaration under penalty of perjury
 3        that the foregoing testimony is true
 4        and correct.
 5
 6              Executed this 27 day of
 7        December          ,
 8        2011, at  Glendale             ,
 9        California.
10
11
12
13
14        _____
15                   BLANCA GONZALEZ
16
17
18
19
20
21
22
23
24
25
```

**Exhibit 8**

```
 1   STATE OF CALIFORNIA      )
 2                            )   ss
 3   COUNTY OF LOS ANGELES    )
 4      I, Willie Anderson, Jr., Certified Shorthand Reporter
 5   qualified in and for the State of California, do hereby
 6   certify:
 7         That the foregoing transcript is a true and
 8   correct transcription of my original stenographic notes.
 9         I further certify that I am neither attorney or
10   counsel for, nor related to or employed by any of the parties
11   to the action in which this proceeding was taken; and
12   furthermore, that I am not a relative or employee of any
13   attorney or counsel employed by the parties hereto or
14   financially interested in the action.
15      IN WITNESS WHEREOF, I have hereunto set my hand
16   this 5th of December, 2011
17
18
19                          Willie Anderson, Jr.,
                                CSR No. 13385
20
21
22
23
24
25
```

**Exhibit 8**

Balasanyan et. al. v. Nordstrom

### ERRATA SHEET

| Page | Line | Correction | Reason for Change |
|------|------|-----------|-------------------|
| 14 | 8 | Change "No." to "Yes." | Refreshed recollection after reviewing documents related to the dispute resolution program roll-out. |
| 29 | 11 | Change "No." to "Yes, at that time. She said she would sign it later, but never did." | Clarification after reviewing question. |

Firmwide:106153096.1 058713.1031

**Exhibit 8**

## UPDATE TO DISPUTE RESOLUTION PROGRAM

### ROLL-OUT OF PROGRAM TO CURRENT EMPLOYEES

REQUIRED ACTIONS
1. Meet with your team to rollout updated dispute resolution program
2. Review Talking Points (below) with your team
3. Hand out Dispute Resolution program (with Acknowledgement stapled to on top)
4. Request and obtain signatures from all employees on acknowledgement forms.
   - Make a copy of the signed Acknowledgement page and provide it to the employee if the employee requests it.
   - If an employee refuses to sign the Acknowledgement for any reason, follow-up with them so that they know it is simply an acknowledgment reflecting they received the updated DR Program; it is not an Agreement. We just need to track who received the materials. Let them know if they still choose not to sign, you will notate on the Acknowledgement form that they received the updated Program. Let them know regardless of whether they sign, the updated Program applies to their employment effective immediately.
     What to notate on the form: "On x date, I hand-delivered a copy of the updated DR Program to <employee name> who refused to sign this acknowledgment." Sign your name, print employee number, and date.
5. Record employee acknowledgement information on the report and return completed reports and signed acknowledgement forms to Human Resources.



### TALKING POINTS FOR DEPARTMENT MANAGERS
- You should have received the Program via mail back in June but we want to ensure you have the most current version
- The program has been updated for two main reasons:
  - to provide further clarification on what claims are covered by arbitration
  - to update the phone number
- We want to provide you a copy of an updated Dispute Resolution Program and emphasize how important the open door process is to the company
- The door is always open should you have any questions or concerns related to work; every employee should feel that their work-related concerns are heard and when appropriate acted upon; this Program ensures that happens, which means a better working relationship and stronger company all around
- For tracking purposes, I need you to sign this form acknowledging that you have received the new Program

### QUESTIONS AND ANSWERS
Q. Do I have to sign the Acknowledgement form?
A. The Acknowledgement form simply acknowledges that you have received the Program information. If you choose not to sign the Acknowledgement form, HR will document that you have received the information. Regardless of whether you sign it, the updated Dispute Resolution Program applies to your employment effective immediately.

Q. Why did you mail the program to me in June and you are now asking me to sign it?
A. We wanted to mail it out pre-Anniversary so that we could reach the largest group possible; as a regular employee, we want to talk to you about the importance of the open door and ensure you have the most current version.

Q. I have specific questions about the Program itself. Who can I talk to?
A. HR is your best resource for any detailed or specific questions about the Dispute Resolution Program.

For Manager Use Only – Not To Be Distributed

2734_DM_TalkingPoints_082411

**NORDSTROM**

Exhibit ___1___
GONZALEZ
11 / 18 / 11 ___ pgs.
Willie Anderson, Jr., CSR 13385

**Exhibit 8**



# Nordstrom Dispute Resolution Agreement

I acknowledge that I have received a copy of the Nordstrom Dispute Resolution Agreement
and understand that it will continue to apply even after my separation from Nordstrom.

_Nine Nalbandian_      _6712418_
**Employee Name (please print)**      **Employee Number**

                       _9/30/11_

**Employee Signature**   _— Bianca Gonzalez_   **Date**

_On 9/30, I hand delivered a copy of the updated DR program to_
_Nine Nalbandian who refused to sign this acknowledgment_

_If you are under the age of 18 (and are un-emancipated), your parent or legal guardian
must also sign below._

_____
**Parent /Legal Guardian Name Signature (please print)**

_____
**Parent /Legal Guardian Name Signature**      **Date**



Exhibit _2_
GONZALEZ
_11_/_18_/11 _1_ pgs.
Willie Anderson, Jr., CSR 13385

## NORDSTROM

1   JULIE A. DUNNE, Bar No. 160544
    LARA K. STRAUSS, Bar No. 222866
2   JOSHUA LEVINE, Bar No. 239563
    LITTLER MENDELSON
3   A Professional Corporation
    501 W. Broadway, Suite 900
4   San Diego, CA 92101.3577
    Telephone: 619.232.0441
5
    Attorneys for Defendant
6   NORDSTROM, INC.

7

8                        UNITED STATES DISTRICT COURT

9                      CENTRAL DISTRICT OF CALIFORNIA

10  GINA BALASANYAN; NUNE              Case No. 11cv5689 DDP (JCGx)
    NALBANDIAN, on behalf of
11  themselves all others similarly    **DECLARATION OF BLANCA**
    situated,                          **GONZALEZ IN SUPPORT OF**
12                                     **MOTION TO COMPEL**
                Plaintiff,             **ARBITRATION AND STAY ALL**
13                                     **CIVIL COURT PROCEEDINGS**

14      v.
                                       Date:    November 7, 2011
15  NORDSTROM, INC., a Washington      Time:    10:00 a.m.
    Corporation; and DOES 1-100,       Ctrm.:   3
16  inclusive,                         Judge:   Hon. Dean Pregerson

17              Defendant.

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON   DECLARATION OF BLANCA GONZALEZ
A PROFESSIONAL CORPORATION
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441
                                                                    11cv5689

Exhibit 3
GONZALEZ
11/18/11   3 pgs.
Willie Anderson, Jr., CSR 13385

**Exhibit 8**

1    I, Blanca Gonzalez, declare and state as follows:

2    1.    I am employed by Nordstrom, Inc. ("Nordstrom") in California as the

3    Human Resources Manager for the store located at the Glendale Galleria in Los

4    Angeles County, California ("Glendale Galleria store"). I am an authorized custodian

5    of Nordstrom's records pertaining to human resources matters at the Glendale Galleria

6    store, including the dates individuals worked for Nordstrom, the distribution of human

7    resources policies and documents to employees and documents maintained by

8    Nordstrom's human resources employees. All of the information set forth in this

9    declaration is based on my personal and first-hand knowledge or based on documents

10   created and kept and practices conducted in the regular course of Nordstrom's

11   business. If called and sworn as a witness, I could and would competently testify

12   thereto.

13   2.    In my role as the Human Resources Manager, I have access to a database

14   that shows dates of employment for Nordstrom employees, store location and current

15   positions. As reflected in that database, Plaintiff Nune Nalbandian is currently

16   employed by Nordstrom as a salesperson at the Glendale Galleria store.

17   3.    In August 2011, Nordstrom distributed an updated Dispute Resolution

18   Agreement, which is part of a document called the Nordstrom Dispute Resolution

19   Program. A true and correct copy of the August 2011 Nordstrom Dispute Resolution

20   Program is attached to this declaration as Exhibit A.

21   4.    The company's roll-out process for the August 2011 Nordstrom Dispute

22   Resolution Agreement included hand-delivery of the document to employees in the

23   Glendale Galleria store, posting the document on the company intranet, and

24   distributing an additional copy of the document to employees along with their pay

25   stub dated September 19, 2011.

26   5.    Because Ms. Nalbandian was on a leave of absence when a copy of the

27   August 2011 Nordstrom Dispute Resolution Agreement was hand-delivered to

28   employees in the store in August 2011 as part of the roll-out, on September 30, 2011, I

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

DECLARATION OF BLANCA GONZALEZ        1.        11cv5689

**Exhibit 8**

1   personally handed Ms. Nalbandian a copy of the August 2011 Nordstrom Dispute
2   Resolution Agreement.  When I began to review the August 2011 Nordstrom Dispute
3   Resolution Agreement with Ms. Nalbandian, she told me that she had already received
4   the copy of the 2011 Nordstrom Dispute Resolution Agreement that was attached to
5   her September 19, 2011 pay stub and thus indicated that she was already familiar with
6   it.  Ms. Nalbandian returned from her leave of absence on or around September 16,
7   2011.

8        I declare under penalty of perjury under the laws of the United States of
9   America and the State of California that the foregoing is true and correct.  Dated and
10  signed on October  7 , 2011, in Glendale, California.

12                              BLANCA GONZALEZ

11
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
501 W. Broadway
Suite 900
San Diego, CA 92101.3577
619.232.0441

DECLARATION OF BLANCA GONZALEZ                2.                        11cv5689

**Exhibit 8**