# EXHIBIT 9

# United States District Court
# Central District Of California

GINA BALASANYAN, an individual, and )
NUNE NALBANDIAN, an Individual on )
behalf of themselves an all others similarly )
situated, )
                                                      )    Case No.:    CV-11-05689-DDD- (JCGx)
           Plaintiffs, )
vs. )
                                 )    **CERTIFIED COPY**
NORDSTROM, INC., a Washington )
corporation; DOES 1-100, inclusive, )
           Defendants. )

DEPOSITION OF
MAHA REZKALLA

Location:      6310 San Vicente Boulevard, Suite 360
Los Angeles, California 90048

Date:      Friday, November 18, 2011 11:59 p.m.

Reporter:      Willie Anderson, Jr.,
Certificate Number    13385



International Tower
888 S. Figueroa Street, Suite 840, Los Angeles, CA 90017
Main No. (866) 472-4700, Fax (213) 688-9636
www.hanesreporters.com

**Exhibit 9**

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.664   Page 3 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Maha Rezkalla

```
 1                   UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   GINA BALASANYAN, an      )
     individual, and NUNE     )
 6   NALBANDIAN, an           )
     Individual on            )
 7   behalf of themselves     )
     and all others           )
 8   similarly situated,      )
                              )
 9        Plaintiffs,         )
                              )
10        vs.                 ) Case No. CV-11-05689-DDD (JCGx)
                              )
11   NORDSTROM, INC., a       )
     Washington corporation;  )
12   DOES 1-100, inclusive,   )
                              )
13        Defendants.         )
     _____)

14

15

16

17

18

19                     DEPOSITION OF
                       MAHA REZKALLA
20

21              Friday, November 18, 2011

22                     11:59 a.m.

23              6310 San Vicente Boulevard
                SUITE 360
24              Los Angeles, California

25
```

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.665   Page 4 of 16

Gina Balasanyan vs. Nordstrom, Inc.                              Deposition of Maha Rezkalla

**Page 2**

Deposition of MAHA REZKALLA, called as a witness by the Plaintiffs, before WILLIE ANDERSON, JR., Certified Shorthand Reporter Number 13385, for the State of California, with principal office in the County of Los Angeles, commencing at 11:59 a.m., Friday, November 18, 2011, at 6310 San Vicente Boulevard, Los Angeles, California.

\* \* \*

APPEARANCES:

FOR THE PLAINTIFFS GINA BALASANYAN AND NUNE NALBANDIAN:

   SCHWARCZ, RIMBERG, BOYD & RADER, LLP
   BY: SHERLI SHAMTOUB, ESQ.
   6310 San Vicente Boulevard
   Suite 360
   Los Angeles, California 90048
   (323) 302-9488 x 209
   sshamtoub@srbr-law.com

FOR THE DEFENDANTS NORDSTROM, INC.:

   LAW OFFICES OF LITTLER, MENDELSON
   BY: LARA K. STRAUSS, ESQ.
   501 West Broadway
   Suite 900
   San Diego, California 92101-3577
   (619) 232-0441

APPEARING TELEPHONICALLY:

   ROSA FRUEHLING-WATSON, ESQ.

ALSO PRESENT:

   Sonseraye Anderson

**Page 3**

         I N D E X

Examination                    Page
By Ms. Shamtoub                  4

         PLAINTIFFS' EXHIBITS

               (None.)

         QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
         Page       Line
               (None.)

         INFORMATION REQUESTED
         Page       Line
               (None.)

**Page 4**

            MAHA REZKALLA,
called as a witness by and on behalf of the Plaintiffs, having been first duly sworn, was examined and testified as follows:

            EXAMINATION
BY MS. SHAMTOUB:
    Q. Can you please state your name for the record.
    A. Maha Rezkalla.
    Q. Can you please spell your last name.
    A. R-e-z-k-a-l-l-a.
    Q. And can you please state your current address and phone number?
    A. 540 Sierra Meadow Drive.
        MS. STRAUSS: And I'll just ask that she not give her phone number. She's welcome to give her work number or you can have the number of the store.
        THE WITNESS: Sierra Madre, California 91024, and my work phone number, (626)294-1395.
BY MS. SHAMTOUB:
    Q. And Mrs. Rezkalla, have you been deposed before?
    A. Have I been to?
    Q. Have you been in a deposition before?
    A. No.

**Page 5**

    Q. Been deposed?
    A. No.
    Q. So before we begin, I'm just going to go through the attorney admonitions which, basically, sets the ground works of the deposition today.
    A. Okay.
    Q. So a deposition is, essentially, a question-and-answer series. I'm the person that's tasked with asking the questions, and your role is to respond to the questions that I ask.
        Throughout this process, if you don't know the response -- if you don't know the answer to any of the questions I ask you, you're entitled to say that you don't know.
        In the event that you don't know, I am entitled to ask you further questions to attempt to jog your memory.
        If you do remember later on and I ask you a question, then I'm entitled to whatever you remember; okay?
    A. Okay.
    Q. So first off, I'd like to remind you that you are under oath, and so that carriers the same weight and force as if you were in a courtroom; okay?
    A. I understand.

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.666   Page 5 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Maha Rezkalla

Page 6

1   Q. Do understand that?
2   A. Yeah.
3   Q. Please answer to the best of your ability. If
4 you answer a question, the assumption is that you
5 understand the question that's being asked of you.
6   A. Okay.
7   Q. If you do not understand a question that I ask
8 you, please ask me to stop to clarify, and I'll be more
9 than happy to do so; okay?
10   A. Okay.
11   Q. Please do not guess, but I may ask of you to
12 give an estimate.
13      Do you understand the difference between a
14 guess and an estimate?
15   A. Yes.
16   Q. Just to clarify to make sure we all
17 understand. An estimate would be something that's
18 based in actual personal knowledge.
19      So for instance, if I was to say, "Can you
20 give me the length and the width of this particular
21 conference room table, you can give me an estimate
22 because you can see it. It's in front of you.
23      If I were to ask you to give me the length and
24 the width of the conference room table in the adjacent
25 conference room, you wouldn't because you haven't seen

Page 7

1 that conference room.
2      Do you understand?
3   A. I understand.
4   Q. Please, also, answer every question verbally.
5 So no hand gestures, no head gestures; okay?
6   A. (Nods.) I just did.
7   Q. It's typical. Actually, I do it myself all
8 the time. So if I see you doing it, I'll make sure to
9 ask you to give a verbal response.
10      If you catch yourself doing it, you know,
11 just -- it's okay if you nod, but make sure that you,
12 also, verbally say "yes" or verbally say "no" or
13 whatever it is that you intend to say; okay?
14   A. Okay.
15   Q. And as a courtesy to the court reporter,
16 please don't respond to any questions until I finish
17 the question.
18   A. Okay.
19   Q. And have you taken any medications today that
20 might impair your ability to give the best testimony
21 that you could give?
22   A. No.
23   Q. Have you spoken to anybody besides your lawyer
24 about the deposition today?
25   A. No.

Page 8

1   Q. And have you reviewed any documents in
2 preparation for the deposition today?
3   A. Yes.
4   Q. What documents did you review?
5   A. I -- you mean by myself or?
6   Q. By yourself, by somebody else. Just what
7 documents did you review prior to the depo?
8   A. Lara showed me the, you know, copy from the --
9 what is it called? The agreement -- or not the
10 agreement. Let's see. Let me remember.
11      The arbitration that we handed out to the
12 employees. So she showed me -- was just the copy that
13 I handed out to the employees, and that was -- that was
14 the one document that I saw.
15   Q. Thank you. Okay. So during this deposition,
16 the court reporter here is going to write out
17 everything that we're saying.
18   A. Okay.
19   Q. At the end of the deposition, the transcript
20 will be sent to your attorney, and you'll have an
21 opportunity to review it.
22      At that time you'll have an opportunity to
23 make any corrections or any changes to any of the
24 testimony that you provide.
25      Please keep in mind that, if you do make any

Page 9

1 corrections or changes to your testimony, then anybody
2 has the opportunity to, then, make comments about the
3 changes or the corrections to the testimony and that
4 may impair -- that may affect your credibility.
5      So keep that in mind today, as we go forward
6 and you provide your answers, to provide the best
7 answers that you can, possibly, provide. And if you
8 don't know the response to something, that you simply
9 state that you do not know.
10   A. Okay.
11   Q. And Mrs. Rezkalla, what's your current
12 position?
13   A. I manage the St. John's Department in
14 Nordstrom in Arcadia.
15   Q. And how long have you held this position?
16   A. A little over nine years.
17   Q. During the time period that you were at
18 Nordstrom, did Nordstrom have a Dispute Resolution
19 Program?
20   A. Yes.
21   Q. And do you know if Nordstrom made some changes
22 to its Dispute Resolution Program in June of 2011?
23   A. I don't know the date, but I know they made
24 changes.
25   Q. Do you know if in 2011 Nordstrom twice made

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.667   Page 6 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Maha Rezkalla

**Page 10**

1  changes to their Dispute Resolution Program?
2  A. I remember -- yes. I remember receiving
3  something in the mail at home, and then I remember, you
4  know, in August or around that time saying that they
5  did some changes to the verbiage, and they need to
6  update everyone's file.
7      So I'm not sure if it's the same or two
8  different times or what.
9  Q. And the first time that Nordstrom made the
10 changes, were you informed in the store about the
11 changes or did you just receive it, as you just stated,
12 in the mail?
13 A. I received something in the mail, yeah. But I
14 didn't -- I don't know because I didn't read it. So I
15 don't know if it was a change or a reminder or what,
16 but I received something in the mail about the same
17 problem. When I read the title, I assumed that's the
18 same subject.
19 Q. But were you informed of any of those changes
20 to the -- as to the first roll-out, by your HR
21 department?
22 A. The ones that we received by mail?
23 Q. Uh-huh.
24 A. No. I just received it by mail. HR was not
25 involved.

**Page 11**

1  Q. And then the second roll-out, do you recall
2  when that was?
3  A. I think it was around August.
4  Q. And for that particular roll-out, did you
5  receive anything in the mail?
6  A. No.
7  Q. When were you first informed of the August
8  roll-out?
9  A. When? Particular day, you mean?
10 Q. If you can't recall the date, that's fine. If
11 you can recall the month?
12 A. Towards the end of August.
13 Q. And how were you informed of the new Dispute
14 Resolution Program?
15 A. The HR manager gave me forms. Well,
16 apparently there was a meeting, and I did not attend
17 the meeting.
18     So she gave me a form to hand out to my team,
19 and she explained to me that there is a change in the
20 verbiage and that we need to sign and update all
21 employees' files.
22 Q. Why didn't you attend the meeting?
23 A. I don't remember. Maybe scheduling or -- it
24 was not the meeting for that particular thing. It
25 was -- we, usually, have managers' meetings set up.

**Page 12**

1  And maybe that was one of the subjects that was
2  discussed, but I was not there.
3  Q. However, afterwards, did you meet with HR and
4  did they go over the Dispute Resolution Program with
5  you?
6  A. HR met with me and handed me the forms with
7  the explanation that there is a change in the verbiage
8  and that we need to update. It needs to be signed, and
9  update employees' files.
10 Q. Were you informed what the exact changes were?
11 A. No.
12 Q. Were you given any talking points of what to
13 say to your employees in your department about the new
14 Dispute Resolution Program?
15 A. That there is a change in the verbiage and
16 that they need to update the files accordingly.
17 Q. Were you given any other instructions?
18 A. No.
19 Q. Did you receive any writings reflecting the
20 changes? Any documents?
21 A. No.
22     MS. STRAUSS: Objection. Can you read that
23 back?
24     (The record was read by the Court
25     Reporter as follows:

**Page 13**

1  "Q. Did you receive any writings
2  reflecting the changes? Any
3  documents?")
4      MS. STRAUSS: Objection. Vague.
5      You mean as opposed to the agreement itself?
6      MS. SHAMTOUB: Yes.
7      MS. STRAUSS: Go ahead.
8      THE WITNESS: Different than the agreement
9  itself?
10 BY MS. SHAMTOUB:
11 Q. Yes.
12 A. No, I didn't.
13 Q. What were you instructed your role was in the
14 roll-out of the new Dispute Resolution Program?
15 A. I was instructed to get employee's signature
16 (sic). And if the employee didn't want to sign, is to
17 just write that "I, Maha Rezkalla, give a copy to"
18 whoever, and put the date. And that will go into the
19 file, and give them a copy.
20 Q. So it was one of your roles to make sure that
21 everybody in your department signed the Acknowledgement
22 of Receipt of the new Dispute Resolution Program?
23     MS. STRAUSS: Mischaracterizes the testimony.
24     You can go ahead.
25     THE WITNESS: Well, that they have a -- I

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.668   Page 7 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                    Deposition of Maha Rezkalla

don't know about sign. Because if they don't want to sign, I would write that I gave them a copy.

So that -- my role is to make sure that they have a copy.

BY MS. SHAMTOUB:

Q. And once an employee, actually, did sign the Acknowledgement, were they required to turn that over to you?

A. Yes.

Q. Were there any instances where the employee turned the document -- turned the Acknowledgement over to HR rather than you?

A. You mean in different situations or this particular instance?

Q. For this particular -- for the roll-out of the August Dispute Resolution Program, were there any situations where the employees in your department, when they signed the Acknowledgement, instead of returning the signed Acknowledgement to you, personally, that they returned it to HR?

A. No. They gave it to me.

Q. After you met with HR regarding the new -- the roll-out of the new Dispute Resolution Program, when were you required to hand the new Dispute Resolution Program out to your employees?

Page 14

Did HR give you a specific timeframe to hand out the HR -- the new Dispute Resolution Program?

A. I don't remember that.

Q. And do you remember how long it took for you to get all the employees in your department to return their Acknowledgement forms?

A. I only have three people in my department. So two of them signed, and one took it home to read and then signed later. So two of them signed, I believe, the same day.

Q. Did HR follow up with you regarding getting back the Acknowledgements for the new Dispute Resolution Program?

A. I give it to HR.

Q. Prior to you giving it to HR --

A. No.

Q. -- did HR ask you for it?

A. No.

Q. Do you know how long it took from the time that you met with HR to the time that you received the Acknowledgements from your employees?

A. I remember that I did it the same day, but I cannot be 200 percent sure.

Q. During your meeting with HR, were you instructed what to do if somebody didn't sign the

Page 15

Acknowledgement form?

MS. STRAUSS: Asked and answered.

But you can go ahead.

THE WITNESS: She -- when she handed out the documents to me, she said if anyone doesn't want to sign, it's okay. You just write that, "I, Maha Rezkalla, handed a copy of the document on this date" you know, to this person. And that would be -- that copy would go into their files.

BY MS. SHAMTOUB:

Q. Are you aware of any impact on the employee for refusing to sign the dispute -- the Acknowledgement for the Dispute Resolution Program?

MS. STRAUSS: Objection. Vague.

You can answer.

THE WITNESS: I'm not.

BY MS. SHAMTOUB:

Q. Were any employees written up for refusing to sign the Acknowledgement? I'm sorry. It seemed like you were about to say something.

Were you about to say something?

A. No.

Q. Were any of the employees written up for refusing to sign the Acknowledgement.

A. No.

Page 16

Q. Were you told not to write anybody up for refusing to sign the Acknowledgement?

A. No.

Q. Were you instructed what to do if somebody requested an opportunity to review the Dispute Resolution Program prior to signing the Acknowledgement form?

A. No. I was not instructed.

Q. And were given any instructions regarding the impact of the Dispute Resolution Program on employees who were, currently, involved in litigation with Nordstrom?

A. No.

Q. Were you instructed about what to say to employees who were currently involved in litigation with Nordstrom?

A. No.

Q. And were you instructed what to say to employees regardless of whether or not they're involved in litigation about the new Dispute Resolution Program?

MS. STRAUSS: Asked and answered.

You can go ahead.

THE WITNESS: I was -- in what case? Just if they don't sign or what do you mean?

///

Page 17

Case 3:11-cv-02609-JM-JLB Document 50-11 Filed 01/12/12 PageID.669 Page 8 of 16

Gina Balasanyan vs. Nordstrom, Inc.      Deposition of Maha Rezkalla

**Page 18**

BY MS. SHAMTOUB:
Q. No. Just, generally, if they asked you questions about the documents that you were handing them.
A. Other than there's a change in the verbiage, that I would usually -- if they wanted additional information, I would, usually, refer them to HR.
Q. Were you instructed what the actual effect of signing the Acknowledgement was?
A. Say that again. I'm sorry.
Q. Did HR instruct you about what the actual effect of signing the Acknowledgement was?
A. No.
Q. So what impact signing the Acknowledgement had on the employees of Nordstrom?
A. No.
   MS. STRAUSS: Objection. Vague.
   THE WITNESS: No. I wasn't --
BY MS. SHAMTOUB:
Q. By signing the Acknowledgement, were the employees entering into an agreement with Nordstrom?
   MS. STRAUSS: Objection. Calls for a legal conclusion. Lacks foundation.
   You can answer based on your personal knowledge, if you can.

**Page 19**

   THE WITNESS: Can you repeat the question.
BY MS. SHAMTOUB:
Q. Were you, specifically, told that by signing the Acknowledgement, that the employee was entering into an agreement with Nordstrom?
A. No.
Q. Were you, specifically, told that by signing the Acknowledgement, that the employees were in fact not entering into an agreement with Nordstrom?
A. No. All I was told was that, you know, that there is a change in the verbiage, and that they needed to update the employee file. And that the employee needs to sign. That's, basically, what I was told.
Q. And do you know or were you told, actually, of any benefits to the employees because of the new Dispute Resolution Program?
A. No.
Q. Are you aware if any employees increased -- received increased wages because of the new Dispute Resolution Program?
A. No.
Q. Are you aware if any of the employees received any types of perks because of the new Dispute Resolution Program?
A. No.

**Page 20**

Q. Did any employees receive any additional time off, for instance, because of the new Dispute Resolution Program?
A. No.
Q. Did any of the employees receive any reduced hours because of the Dispute Resolution Program?
A. No.
Q. Or did they receive any additional discounts for purchases at Nordstrom because of the Dispute Resolution Program?
A. No.
Q. Any other kind of benefits that any employee received because of the new Dispute Resolution Program?
A. No.
Q. Were you instructed that employees could make changes to the Dispute Resolution Program?
A. No.
Q. Do you know if employees could make changes to the Dispute Resolution Program?
A. I don't know.
   MS. STRAUSS: Calls for speculation. Never mind.
   Go ahead.
   THE WITNESS: I don't know that.
///

**Page 21**

BY MS. SHAMTOUB:
Q. And were you ever instructed what to do if an employee did, in fact, make changes to the Dispute Resolution Program?
A. No.
Q. And just to clarify, when I say "the Dispute Resolution Program," I'm speaking of the August one; okay?
A. Okay.
Q. So if at any point you are confused between which one I'm talking about, you can let me know.
   And you testified that you distributed the Dispute Resolution Program to the employees in your department; correct?
A. I did.
Q. I believe you already testified that there're three employees in your department?
A. Yes.
Q. Did anyone in your department refuse to sign the Acknowledgement form.
A. No one refused.
Q. Is anybody in your department a part-time employee?
A. No.
Q. Are they all full-time employees?

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.670   Page 9 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                Deposition of Maha Rezkalla

**Page 22**

Q. And is Ms. Gina Balasanyan in your department?
A. Yes.
Q. And how long have you worked with Ms. Balasanyan?
A. I want to say, probably, two years, but I'm sure we can verify that information.
Q. Did you provide Ms. Balasanyan a copy of the Dispute Resolution Program?
A. Yes.
Q. And were you aware, at the time, that Ms. Balasanyan was involved in litigation?
A. No, I wasn't.
Q. Did you ask Ms. Balasanyan to sign the Acknowledgement?
A. Yes.
Q. Do you recall when you handed her a copy of it?
A. You mean what day? Which day?
Q. If you can recall.
A. I'm not -- like, I'm not 200 percent, but I was thinking about August 28th or August -- you know, that time.
Q. End of August?
A. Yeah. Earlier or after, I don't remember.

**Page 23**

Q. Did Ms. Balasanyan sign the Acknowledgement?
A. No. Not when I handed it out, no.
Q. Did she, eventually, sign the Acknowledgement?
A. Yes.
Q. And at the time that she did sign the Acknowledgement, did she inform you that she was not aware of the contents of the document?
A. No. When I -- when I handed the form to Gina, she asked that she needs to take it home to read. So, you know, that's what happened.
    She took it home to read it. So -- and then she came back -- I want to say two days later, it was on my desk. So I don't know if she didn't understand or anything, but she didn't mention anything to me.
Q. After you gave her the Dispute Resolution Program to take home and read, as you stated, the following day, did you ask her to sign the Acknowledgement?
A. She took the whole thing -- the actual form and the Acknowledgement form, and I want to say, two days later, I found it on my desk.
    So, I'm not 200 percent sure, but sometimes the schedule is -- I'm off, and then Gina's off, and then I come back. So I don't see the employees every single day. Probably, a day or two, sometimes less.

**Page 24**

But I remember, like two days -- around two days later, I found a signed copy on my desk. I have a black tray on my desk, and it was there.
Q. So did you have any conversations, then, with Gina, from the time that you gave her the copy to take home to sign, to the time that you saw the signed Acknowledgement --
A. No.
Q. -- form on your desk?
A. No.
Q. Did you ever inform Ms. Balasanyan that the Acknowledgement -- that the only effect of the Acknowledgement was to show that she received the document?
A. I told Gina that there is a change in the verbiage of the document, and that's why we need to sign it and update her file.
Q. So you did not tell her that the Acknowledgement only meant that she was signing receipt of -- that she was acknowledging that she received the Dispute Resolution Program?
A. No.
    MS. SHAMTOUB: Yes. We have interesting art.
    MS. STRAUSS: You do.
///

**Page 25**

BY MS. SHAMTOUB:
Q. During your employment at Nordstrom, were you aware of any other instances where Nordstrom required current employees to acknowledge receipt of a change to its Dispute Resolution Program?
A. No.
Q. Do you recall whether you have done that in any other circumstance, signed an Acknowledgement of a receipt of a change to Nordstrom's Dispute Resolution Program?
A. Besides that one time, no.
Q. Yeah. And I'm sorry. The precursor to that question was: Did you sign an Acknowledgement?
A. Yes.
Q. Okay. And prior to this time, you don't, then, recall ever having to sign an Acknowledgement of Receipt?
A. No.
    MS. STRAUSS: Are you asking the witness personally?
    Object to that as outside the scope of your deposition agreement, but she's already answered.
BY MS. SHAMTOUB:
Q. You said that you've been working at Nordstrom for nine years?

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.671   Page 10 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                Deposition of Maha Rezkalla

**Page 26**

1   A.   Yeah, nine years.
2   Q.   But with Ms. Balasanyan for only about two
3   years?
4   A.   Yes.
5   Q.   Do you assign Ms. Balasanyan her schedule?
6   A.   Yes.
7   Q.   And does the number of hours assigned to
8   Ms. Balasanyan change per pay period?
9   A.   It could.
10  Q.   Has it changed in the past, say, two months?
11  A.   No.  She averages the same.
12  Q.   How much does she average?
13  A.   She averages around 69 hours per pay period.
14  So if one period is 74, the other pay period can be a
15  little bit less or more just to keep her benefits.
16  Q.   And how many hours do you have to have to keep
17  your benefits?
18  A.   I think 69 per pay period or 69 and a half.
19  Q.   Is Ms. Balasanyan considered a full-time
20  employee?
21  A.   Yes.
22  Q.   What's the average hours assigned to full-time
23  employees?
24       MS. STRAUSS:  Objection.  Calls for
25  speculation.  Lack of foundation.

**Page 27**

1       You can answer for your department.
2       THE WITNESS:  Around 129.
3   BY MS. SHAMTOUB:
4   Q.   129 hours per pay period?
5   A.   Per pay period, yeah.
6   Q.   The pay period is every two weeks?
7   A.   Yes.  Well, what is it?  In five times -- 5 x
8   6 is 30, so around 129 for the month.
9   Q.   For the month?
10  A.   Yeah.
11  Q.   Okay.  So for two pay periods?
12  A.   Yeah.
13  Q.   That makes more sense.  I was, like, wow.
14  That's almost as much as I work.
15  A.   Yeah.
16  Q.   So for two pay periods that's, roughly,
17  129 hours?
18  A.   Yeah.
19  Q.   And is this based -- your calculation of
20  129 hours, is that based on a procedure that Nordstrom
21  has or how are you reaching this number?
22  A.   I don't get the question.
23       MS. STRAUSS:  Objection.  Vague.  I don't
24  understand it either.
25  ///

**Page 28**

1   BY MS. SHAMTOUB:
2   Q.   So your calculation of the 129 hours per two
3   pay periods, this is the number of hours a full-time
4   employee should be working.
5       Is that -- is your calculation based on any
6   guidelines that Nordstrom provides for the assignment
7   of hours to full-time employees?
8       MS. STRAUSS:  Objection.  That
9   mischaracterizes the testimony.
10      You asked her on average about how much would
11  someone end up working, which is what she testified to.
12  BY MS. SHAMTOUB:
13  Q.   All right.  So that's the average then.
14      Do you have -- does Nordstrom have any
15  guidelines about how many hours to assign to a
16  full-time employees per pay period?
17  A.   No.  Really, the guideline is based hours --
18  the hours based on the business.  So if the business is
19  up or down, we -- the hours should reflect that.
20      So that's, basically, the guidelines for
21  Nordstrom.
22  Q.   And in order to receive benefits, how many
23  hours does an employee have to have?
24      MS. STRAUSS:  Objection.  Calls for
25  speculation.  Outside the scope of the deposition

**Page 29**

1   topics.
2       You can answer, if you know.
3       THE WITNESS:  I -- I'm assuming the 69 per pay
4   period 'cause that's what Gina asked me to try to
5   maintain, but, you know, I think HR would be a better
6   resource for that.
7   BY MS. SHAMTOUB:
8   Q.   So how do you determine the number of hours to
9   assign to the employees in your department?
10  A.   Based on -- based on the volume of historical
11  numbers we have from last year, we, you know, guess
12  like -- not guess.
13      But based on the historical numbers, we have,
14  like, the volume from last year per every day or per
15  month, and we base the staffing based on those
16  historical numbers.
17  Q.   And who provides you with -- with these
18  numbers?
19  A.   There's a report in the system that you can
20  retrieve, you know, printout, that give you the
21  historical numbers from last year, and, also, there's a
22  report that gives you trends.
23  Q.   And how often do you -- do you create the
24  schedule for the employees in your department?
25  A.   They're twice a month.  So every two weeks.

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.672   Page 11 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                   Deposition of Maha Rezkalla

**Page 30**

1  Q.  And how -- how far ahead, prior to creating
2  the schedule, do you retrieve these historical numbers?
3  A.  We -- we can do it anytime.  We have access to
4  it anytime.
5  Q.  Typically, how far ahead, prior to producing
6  these schedules for the employees in your department --
7  I'm sorry -- prior to handing out the schedules to the
8  employees in your department, do you, actually, produce
9  the schedule?
10     So let's say you hand out the schedule to your
11 employees, for the following pay period, on Monday.
12     How often -- how far ahead of Monday do you,
13 actually, prepare the schedule?  Do you prepare the
14 schedule the Friday before that Monday?
15 A.  As soon as I -- I -- as soon as I can, I hand
16 out the schedule.  So it could be one week before.  It
17 could be a few days before.  Ten days before.
18     As soon as I have enough information, then I
19 hand out the schedule.  The information can be based on
20 the historicals (sic) -- and that I have -- but it
21 could be, also, on future business that we're expecting
22 too.  So that's, you know -- once I have the entire
23 information, I hand out the schedule.
24 Q.  Where did you receive the information about
25 the future business?

**Page 31**

1  A.  It's something that, you know, if I'm planning
2  an event or I am planning to -- you know, yeah.
3     If I'm planning an event or we think --
4  there's a sale is going to break, as soon as I get the
5  confirmation of that from the buying office or they
6  approve my event, then I base the schedule on that.
7  Q.  And are there any other factors that you base
8  the hours that the employees in your department receive
9  per pay period?  So other than the previous -- the
10 historical numbers from the previous years and the
11 future business?
12 A.  Well, scheduling in Nordstrom is based on --
13 what do you call that? -- people performance.  So
14 it's -- we have, like, No. 1 on the schedule, No. 2 on
15 the schedule, No. 3.
16     So -- which -- it really matters in
17 departments where they have big -- a lot of people, but
18 for us, No. 1 on the schedule is the highest performer.
19     You know, the -- you know that -- their PTR,
20 what we call "PTR" is far and above.  So they get
21 priority on the schedule.
22 Q.  And can you please explain what -- what does
23 PTR stand for?
24     MS. STRAUSS:  Counsel, I'll just -- we're
25 getting pretty far afield from the deposition topics

**Page 32**

1  here so I'll give you a little bit more leeway, but at
2  some point I'm going to ask you what in the world does
3  this have to do with our deposition topic.
4     MS. SHAMTOUB:  Okay.
5     MS. STRAUSS:  You can go ahead.
6     THE WITNESS:  PTR -- okay.  I have to know
7  that.  Performance -- I don't know.  Performance-
8  something rating.  I don't know.
9  BY MS. SHAMTOUB:
10 Q.  So you determine the hours that the employees
11 in your department are assigned based on their
12 performance, and their performance is based on their
13 PTR.  I just want to make sure I'm understanding that
14 correctly.
15 A.  Right.  So PTR is how much they sell per hour
16 determines what their volume at the end of the year or
17 every two months or whatever.
18     So if someone sells $100 per hour, times the
19 number of hours, this is how much they sell for the pay
20 period.  If someone sells $500 per hour times the
21 number of hours, that's their PTR.
22 Q.  Okay.  And has Miss -- and would this also be
23 the ranking?  The ranking, then, is based on the
24 performance; correct?
25 A.  Uh-huh.

**Page 33**

1     MS. STRAUSS:  "Yes"?
2     THE WITNESS:  Yes.
3  Q.  Has Ms. Balasanyan's ranking changed within
4  the past two months?
5  A.  No.
6  Q.  Has her ranking changed within the past six
7  months?
8  A.  No.
9  Q.  And how do you determine -- are there more
10 desirable shifts and less desirable shifts in your
11 department?
12 A.  You know, people like to work certain days,
13 and I try to accommodate that as much as I can.
14 Q.  But are there certain days where the volume of
15 customers are higher -- or certain shifts where the
16 volume of customers are, historically, higher than
17 other shifts?
18     MS. STRAUSS:  I'm just going to object.
19 Outside the scope.  If you want to establish some
20 foundation for that.
21     MS. SHAMTOUB:  This all goes to the issue of
22 retaliation whether there was a change in shift.  The
23 other issue was whether or not there was a change in
24 any of the ranking of Ms. Balasanyan.
25     So I'm trying to understand whether or not, A,

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.673   Page 12 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                Deposition of Maha Rezkalla

**Page 34**

1  if there are desirable shifts, whether or not
2  Ms. Balasanyan has maintained the shift that she was,
3  previously, assigned. So I think it's within the
4  scope.
5       MS. STRAUSS: Well, I mean, from our
6  discussions, Ms. Nalbandian had some issues or concerns
7  about that, but I'm not aware of anything that would
8  suggest that for Ms. Balasanyan, which is who this
9  witness is for.
10      MS. SHAMTOUB: So, again, we'd like to
11 establish that. If that's not the case --
12      MS. STRAUSS: Then you need to ask the
13 foundational questions before you start asking
14 questions that have to do with things you haven't laid
15 a foundation for.
16      So you just asked a foundational question that
17 her ranking hasn't changed at all. So if there's some
18 issue that you need foundation for, in terms of the
19 scheduled shifts, you need to ask that before you get
20 into a lot of detailed questions that may not be
21 relevant, please.
22 BY MS. SHAMTOUB:
23   Q. Has Ms. Balasanyan's shifts changed within the
24 past two months?
25   A. There is no one that has same shifts all the

**Page 35**

1  time. I mean, this is -- we're in retail so things can
2  change. I have people that, you know, don't want to
3  work certain days, but if we're short staffed or if
4  someone is on vacation or if we have an event that day
5  or if we have a sale that day, they will have to work
6  that day.
7       So there is no -- retail is different. We
8  don't have set -- we try to maintain set schedules
9  because we want customers to -- to find, you know, to
10 know the people's schedule and feel free to walk in and
11 deal with the same person.
12      But this is retail so we don't know. If
13 anyone is sick, then schedules change. If anyone is,
14 you know, submitting their resignation or not working
15 anymore or we have, as I said, events, then I change
16 the schedule, so.
17      There is no set -- 100 percent set schedule.
18 No one has that. But we -- as -- I try to maintain
19 certain days for them to help them with their business,
20 but it's not something that is required or, you know,
21 expected from us to do.
22   Q. So has Ms. Balasanyan, specifically, asked you
23 for certain shifts in the past couple of months?
24   A. Gina likes to take Mondays off, but this has
25 changed a couple of times -- actually, two times.

**Page 36**

1  Well, I don't know how many times.
2       It has changed when her husband was on -- had
3  some kind of medical procedures. So she asked me that
4  she wants to work on Sunday and Monday and take,
5  instead, a day off during the week because she has
6  someone that can watch her husband during those two
7  days, and she would rather be with him, you know, in
8  the middle of the other two.
9       So I was able to accommodate her request, and
10 then the other thing that took place -- you know, I
11 mentioned that I have three people in my team, and one
12 of them gave notice around October 15th or so.
13      But she agreed to stay on until I find -- you
14 know, to help me out -- until I find a replacement and
15 I hire someone and -- but with that, she gave me
16 certain days that she cannot work, and that was Mondays
17 and Thursdays.
18      So, you know, that person is leaving. She's
19 doing me a favor staying until I find the right person
20 for the department. So I had to change some -- I
21 needed a coverage on Monday.
22      And Gina -- I worked in the morning, and Gina
23 would close at night, and she would be off Sunday
24 instead of Monday.
25   Q. So she will not be working on Sundays? I'm

**Page 37**

1  sorry. I didn't understand.
2    A. I mean, she could. Some days she works
3  Sunday, and some days she took -- I would give her
4  Sunday off and have her work Monday. I mean, we can
5  get a copy from the schedules.
6       I don't remember all the schedules, but
7  what -- usually, Gina wanted to be off Monday, but
8  because I was short staffed, I needed someone to work
9  Monday.
10   Q. And what's the more high volume -- what's the
11 highest volume day of the week in terms of --
12   A. It really depends. I mean, sometimes the
13 weekend, but sometimes the weekend is zero or negative.
14      You know, retail is not -- is hard to --
15 there's no science to it. You know, we do have
16 customers that come during the week. That -- they're
17 serious shoppers, and they don't want to bother with a
18 crowd on the weekends.
19      It's really hard to -- you know, there's no
20 science to it. And a lot of times with established
21 sales people, it's good to have time during the week
22 where they can get their best customers in and work
23 with them without, like, really being interrupted with
24 walk -- walk-ins and so forth.
25      Because our department is a little different,

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.674   Page 13 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                  Deposition of Maha Rezkalla

you know, it's central, and it's more about appointments versus walk up.
   Q. Oh, I see. So the employee sets up appointments with their clients?
   A. Well, I mean, that's how -- mostly what, you know -- what drives our business.
   Q. And when you're not on the floor, who's in charge of your department?
       MS. STRAUSS: Objection. That's outside the scope.
       You can go ahead.
       THE WITNESS: There's always a manager in charge in the store.
BY MS. SHAMTOUB:
   Q. Does this person ever assign shifts or assign the hours?
   A. No.
   Q. Have you discussed Ms. Balasanyan's litigation with anybody at Nordstrom?
       MS. STRAUSS: Besides attorneys.
BY MS. SHAMTOUB:
   Q. Yes. Everything is besides the attorney. You cannot reveal communications you had with attorneys.
   A. No.
   Q. Have you ever heard anyone at Nordstrom

Page 38

discussing Ms. Balasanyan's lawsuit?
   A. Our HR had informed me that there is -- I don't know the details, but there is some kind of conflict or a lawsuit that Gina has against Nordstrom.
   Q. Were you informed about the topic of the lawsuit?
   A. She doesn't have information. She told me she doesn't have information.
   Q. Does Ms. Balasanyan have a strong sales per hour?
   A. Strong sales? She's No. 2 on the schedule.
   Q. So No. 2 on the schedule means what, exactly?
   A. It means she has No. 2 volume in the department.
   Q. Does that have any other implications?
   A. No.
   Q. Do you --
       MS. STRAUSS: Objection. Vague.
       THE WITNESS: I don't understand.
BY MS. SHAMTOUB:
   Q. Do you assign her more hours? Does she get more hours than the No. 3 on the schedule?
   A. She would get more hours, yes.
   Q. How many more hours does she get than --
   A. I really don't -- I try to give her her hours

Page 39

to maintain her full -- her benefits, like, medical and all of that. So that's her -- you know, that's what I try to maintain.
       MS. SHAMTOUB: That's all the questions I have for you. I don't know if Lara has any follow-up questions that she wants to ask you.
       MS. STRAUSS: I don't have any questions, but we'd like to reserve the right for the witness to make changes to the transcript, please.
       MS. SHAMTOUB: Certainly, yes. So that ends our deposition for today. I hope it wasn't very painful. So the original transcript will be sent to your attorney.
       THE WITNESS: Yes.
       MS. SHAMTOUB: The attorney for Nordstrom, and she will -- Lara will then send that transcript over to you. You'll have an opportunity -- 15 days to review the transcript.
       If -- again, if you have any changes or corrections that you want to make to the transcript, you're welcome to do so at that time.
       If we're not notified within 15 days of Nordstrom's receipt of the transcript or any changes to it, then we're gonna assume that you've signed the transcript and no changes have been made; okay?

Page 40

       MS. STRAUSS: Could we do the stipulation so she has 15 days to review, and then we have five days to get any changes to your office?
       MS. SHAMTOUB: Okay.
       MS. STRAUSS: Is that okay?
       MS. SHAMTOUB: Yeah. That's fine. Yeah. Yeah. That's fine.
       So 15 days for you, and then five days for Nordstrom to get it to us. I can stipulate to the other one too.
       So counsel for Nordstrom will maintain the original of the transcript, and they'll produce it at the time of trial.
       If the original is lost or otherwise is unavailable, then I certified copy can be used in its place.
       So stipulated?
       MS. STRAUSS: So agreed.
       And just to be clear that the court reporter will be relieved of any duties with respect to retention of the original transcript.
       The original transcript will be forwarded to our office, and then our office will retain the original of the transcript providing any changes to your office within the timeframe we've agreed.

Page 41

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.675   Page 14 of 16

Gina Balasanyan vs. Nordstrom, Inc.                               Deposition of Maha Rezkalla

```
 1   So stipulated.
 2   MS. SHAMTOUB: And that's it. Thank you.
 3   (Whereupon, the proceedings recessed at
 4   the hour of 12:56 p.m.)
```

Page 42

```
 1      I certify or declare under
 2   declaration under penalty of perjury
 3   that the foregoing testimony is true
 4   and correct.
 5
 6      Executed this ____ day of
 7   _____,
 8   2011, at _____,
 9   California.
...
14      ─────MAHA REZKALLA─────
```

Page 43

```
 1  STATE OF CALIFORNIA     )
                            ) ss
 2  COUNTY OF LOS ANGELES   )
 3
 4      I, WILLIE ANDERSON, JR., Certified Shorthand
 5  Reporter qualified in and for the State of California,
 6  do hereby certify:
 7      That the foregoing transcript is a true and
 8  correct transcription of my original stenographic
 9  notes.
10      I further certify that I am neither attorney or
11  counsel for nor related to or employed by any of the
12  parties to the action in which this proceeding was
13  taken; and furthermore, that I am not a relative or
14  employee of any attorney or counsel employed by the
15  parties hereto or financially interested in the action.
16      IN WITNESS WHEREOF, I have hereunto set my hand
17  this _____ day of _____, 2011.
...
22                  WILLIE ANDERSON, JR.
23                  CSR No. 13385
```

Page 44

Case 3:11-cv-02609-JM-JLB   Document 50-11   Filed 01/12/12   PageID.676   Page 15 of 16

Gina Balasanyan vs. Nordstrom, Inc.                                   Deposition of Maha Rezkalla

```
 1          I certify or declare under
 2     declaration under penalty of perjury
 3     that the foregoing testimony is true
 4     and correct.
 5
 6          Executed this  21   day of
 7     December,
 8     2011, at    ARCADIA          ,
 9     California.
10
11
12
13
14     _____
              MAHA REZKALLA
15
```

```
1   STATE OF CALIFORNIA      )
2                            ) ss
3   COUNTY OF LOS ANGELES    )
4       I, Willie Anderson, Jr., Certified Shorthand Reporter
5   qualified in and for the State of California, do hereby
6   certify:
7           That the foregoing transcript is a true and
8   correct transcription of my original stenographic notes.
9           I further certify that I am neither attorney or
10  counsel for, nor related to or employed by any of the parties
11  to the action in which this proceeding was taken; and
12  furthermore, that I am not a relative or employee of any
13  attorney or counsel employed by the parties hereto or
14  financially interested in the action.
15      IN WITNESS WHEREOF, I have hereunto set my hand
16  this 5th of December, 2011.

                                Willie Anderson, Jr.,
                                CSR No. 13385
```

HinesReporters.Com, Inc.

**Exhibit 9**