UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA BALASANYAN; NUNE NALBANDIAN, on behalf of themselves all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>NORDSTROM, INC., a Washington Corporation; and DOES 1-100, inclusive,<br><br>　　　　　Defendants. | Case Nos. 11-cv-2609-JM-WMC<br>10-cv-2671-JM-WMC<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION AND GRANTING MOTION TO CONSOLIDATE CASES**<br><br>11-cv-2609 Docket No. 39<br><br>10-cv-2671 Docket No. 25 |
| GINO MAREVENTANO; and NEESHA KURJI,<br>　　　　　Plaintiffs,<br>　v.<br><br>NORDSTROM, INC., a Washington Corporation; and DOES 1-100, inclusive,<br><br>　　　　　Defendants. | |

　　　Two proposed class action cases against Nordstrom, Inc. ("Nordstrom") are currently in front of this court. In Case No. 11-cv-2609 ("Balasanyan"), Plaintiffs filed the action in Los Angeles Superior Court on April 5, 2011. It was removed to federal court, then transferred to this court on November 9, 2011. Nordstrom now moves to compel arbitration. In Case No. 10-

1

cv-2671 ("Mareventano"), Plaintiffs filed the complaint in San Diego Superior Court, North County, in October of 2010, and the case was removed to this court in December of 2010. Nordstrom moves to consolidate the two cases if its motion to compel arbitration is denied. For the reasons stated below, the motion to compel arbitration is DENIED, and the motion to consolidate the cases is GRANTED.

**I. BACKGROUND**

The Balasanyan complaint alleges that Nordstrom has underpaid its sales staff across the country. The named Plaintiffs are both salespersons at Nordstrom stores in Los Angeles County. Plaintiffs and members of the proposed class are paid commission wages based on net sales. First Amended Complaint ("FAC") ¶ 11. However, Nordstrom's policy manuals require salespeople to spend at least thirty minutes per work shift on assignments that cannot lead to making sales, such as stocking merchandise and taking inventory. ¶ 13. Nordstrom allegedly also requires employees to spend at least thirty additional minutes per work shift performing marketing activity such as contacting customers to inform them of new product lines. ¶ 14. According to the FAC, "[t]he combined time Plaintiffs and Class Members are required to engage in non-commission producing activities totals at least one (1) hour and fifteen (15) minutes per work shift" for which there is no compensation. ¶ 15.

The Balasanyan FAC states five causes of action: (1) Nonpayment of wages under Cal. Labor Code §1194, § 1197; (2) Nonpayment of wages under 29 U.S.C. § 206 (the Fair Labor Standards Act); (3) Declaratory Relief under Cal. Civ. Code Proc. § 1060; (4) Unfair Business Practices under Cal Bus. & Prof. Code § 17200; and (5) a PAGA claim under Cal. Labor Code § 2699.

Plaintiff Mareventano was an employee of Nordstrom in San Diego County and Plaintiff Kurji was an employee in Orange County. Unlike Balasanyan, the proposed Mareventano class only consists of California employees. The Mareventano FAC alleges that Nordstrom failed to

2

1  pay employees for "stocking time . . . unless they failed to meet their minimum commission
2  draw." ¶ 21.  It states four causes of action: (1) Violation of Cal. Labor Code § 1194, § 1197; (2)
3  Violation of Cal. Labor Code §§ 201-203; (3) Willful violation of Cal. Labor Code § 226; (4)
4  Unfair Business Practices under Cal. Bus. & Prof. Code § 17200.

**II. LEGAL STANDARD AND DISCUSSION**

**A. Motion to Compel Arbitration**

1. The Arbitration Agreement

Nordstrom's motion to compel arbitration ("Arb. Mtn.") argues that the court must not hear this case because the parties signed an arbitration agreement, the Nordstrom Dispute Resolution Agreement ("agreement" or "DRA").  Though there has apparently been an arbitration agreement in place since 2004, Defendant asserts that the operative agreement is the one that was "rolled out" in August 2011.  Arb. Mtn. at 2.  The arbitration clause in question is part of Nordstrom's Dispute Resolution Program, which states that it is governed by the FAA and "applies to any disputes arising out of or related to your application for employment with Nordstrom . . . , your employment with Nordstrom or the termination of your employment."  Porter Decl., Ex. A at 2.  Further, the agreement "is intended to apply to the resolution of past, present, and future disputes that otherwise would be resolved in a court of law and requires that all such disputes be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial except as otherwise stated in this Agreement."  Id.  The agreement expressly requires individual arbitration and precludes class or collective arbitration.  Id. at 3.

Apparently, the DRA was originally mailed to employees in June, 2011, which is about two months after the Balasanyan complaint was filed in state court.  In August, Nordstrom employees were given "the most current version" of the DRA at work and asked to sign a form acknowledging receipt of the information.

1    The agreement is a four-page document entitled "Nordstrom Dispute Resolution
2 Program," and one of the sections is entitled "Dispute Resolution Agreement." When Nordstrom
3 provided the agreement to employees, another document entitled "Nordstrom Dispute Resolution
4 Agreement" was attached (hereafter the "acknowledgment"). The acknowledgment asked for the
5 employee's signature below the following statement: "I acknowledge that I have received a copy
6 of the Nordstrom Dispute Resolution Agreement and understand that it will continue to apply
7 even after my separation from Nordstrom." Plaintiffs have also submitted a document they
8 claim was Nordstrom's set of instructions to human resources employees who were to discuss
9 the new policy with employees. Shamtoub Decl. Ex. 5. That document explains that the
10 acknowledgment "is simply an acknowledgment reflecting [the employees] received the updated
11 DR Program; it is not an Agreement." It also says: "Let them know regardless of whether they
12 sign, the updated Program applies to their employment effective immediately."

13    Plaintiff Balasanyan signed the acknowledgment on August 31, 2011. Defendant states
14 that Plaintiff Nalbandian was on a leave of absence when the DRA was given to employees, but
15 that when she returned to work, she informed her HR manager that she had already reviewed the
16 DRA that was attached to her pay stub.

17 2. Validity of the Agreement

18    The parties dispute several issues concerning the validity of the arbitration agreement.
19 Although AT&T Mobility v. Concepcion, 131 S.Ct. 1740 (2011), and subsequent cases have cast
20 doubt on the validity of some California precedent in this area, this court will not reach those
21 issues because purported imposition of the agreement constituted an improper class
22 communication.[1]

---

[1]    Concepcion's holding does not affect this decision—judicial control of class communications is not based in state law, but is derived from Fed. R. Civ. P. 23. See Williams v. Securitas, 2011 U.S. Dist. LEXIS 75502 at *9 (E.D. Pa. 2011).

1  District courts have "broad authority to exercise control over a class action and to enter
2  appropriate orders governing the conduct of counsel and parties." Gulf Oil Co. v. Bernard, 452
3  U.S. 89, 100 (1981).  The Ninth Circuit has affirmed the power of district courts to exercise
4  control over communications with class members.  E.G. Wang v. Chinese Daily News, Inc. 623
5  F.3d 743, 755 (9th Cir. 2010) (vacated on other grounds) (explaining that that "[i]n the face of
6  coercive behavior by a party opposing a class, district courts may regulate communications with
7  class members related to the notice and opt-out processes").  The Wang court also cited Kleiner
8  v. First Nat'l Bank of Atlanta, 751 F.2d 1193 (11th Cir. 1985), noting that "the Eleventh Circuit
9  held that a district court's power to manage a class action included the power to prohibit a
10 defendant from making unsupervised, unilateral communications with the plaintiff class." Id.

11  While Wang dealt with improper attempts to persuade employees to opt out of a class
12 action suit, the district court's power also extends to other communications that would affect
13 participation in the lawsuit, such as the arbitration agreement at issue here.  One case, for
14 example, invalidated an arbitration agreement in part because institution of the agreement after
15 the case had been filed constituted an improper communication with putative class members.  In
16 re Currency Conversion Fee Antitrust Litigation, 361 F.Supp.2d 237 (S.D.N.Y. 2005) (amended
17 on other grounds).  The plaintiffs in that case were Visa and MasterCard cardholders who sued
18 various banks for alleged illegal charges based on foreign currency exchanges.  Several of the
19 banks mailed letters to their cardholders purporting to add an arbitration clause to the cardholder
20 agreements after the litigation had begun, but did not inform the cardholders about the litigation
21 in the notices.  The court first noted that trial courts have authority over defendants'
22 communications with class members under Fed. R. Civ. P. 23(d), id. at 252, and emphasized that
23 a court must protect the interest of putative class members by preventing misleading
24 communications, perhaps even disallowing communications if they attempt to "undermine Rule
25 23 by encouraging class members not to join the suit." Id. (citation omitted).  The court found

1 that because this type of communication had the potential for coercion, given that the
2 cardholders had no other source of information concerning the litigation and they depended on
3 defendants for their credit needs, the actions were improper.  In conclusion, the court held "that
4 [the arbitration clauses in question] may not be enforced because Chase and Citibank added
5 them, without notice, after this litigation commenced."  Id. at 254.  See also Williams v.
6 Securitas, 2011 U.S. Dist. LEXIS 75502 (E.D. Pa. 2011) (invalidating arbitration agreement
7 imposed on defendant's employees during pendency of litigation because it was likely to confuse
8 putative class members about whether agreement required them to opt out).

9   Plaintiffs rely principally on Williams to argue that Nordstrom's imposition of the
10 arbitration agreement constituted an improper communication.  They point out that the
11 agreement was introduced during the pendency of litigation, that Nordstrom did not alert putative
12 class members of the litigation, and that no opt-out was available.  Plaintiffs further argue that
13 the communication was unacceptably confusing because it led employees to believe that they
14 were not entering into an agreement.

15   Nordstrom provides surprisingly little response to Plaintiffs' argument concerning
16 improper communication.  First, it advances an incorrect understanding of Williams in an effort
17 to distinguish that case and provides no thoughtful discussion of Williams or other case law
18 bearing on the issue.

19   Second, Nordstrom states that "the August DRA cannot possibly constitute a misleading
20 communication about the litigation" because the lawsuit was never mentioned in the agreement.
21 Def. Reply at 10.  Of course, by advocating a bright line rule that would focus on whether a
22 communication specifically mentions the lawsuit, Nordstrom misses the point.  One purpose of
23 the court's control over class communication is to prevent improper contacts that could
24 jeopardize the rights of the class members—abdicating that responsibility simply because a
25 defendant does not specifically mention the litigation would defy common sense, as exemplified

in In re Currency Conversion, 361 F.Supp.3d 237.[2]  To allow defendants to induce putative class members into forfeiting their rights by making them an offer and failing to disclose the existence of litigation would create an incentive to engage in misleading behavior.

Nordstrom's final argument is also unsuccessful.  Failing to cite any case law in support, Nordstrom complains that "[i]f any communication sent out to employees who happen to be putative class members constitutes an improper communication, Nordstrom (or any other employer) would have no way of communicating with its own employees about any issue."  Def. Reply at 10.  Naturally it is true that if any communication constitutes an improper communication, it would be impossible for an employer to communicate.  But such a broad rule has not been proposed.  Nordstrom does not (and cannot) explain how invalidation of an arbitration agreement as applied to putative class members can be compared to preventing the company from "communicating with its own employees about any issue."  Clearly, communications concerning unrelated issues would not be problematic, and even communications concerning the litigation might be permissible depending on the circumstances.  Rather, Nordstrom's argument ignores its flawed communication with class members, as well as its inappropriate attempt to impose a binding agreement upon them.[3]

---

[2] Though the employer in Williams did mention the existence of the lawsuit in its communication to the employees, there is no indication the court would have found the arbitration agreement acceptable had the communication not mentioned the lawsuit at all—in fact, the court faulted the defendant for merely naming the lawsuit and failing to explain the nature of the action.  Williams at *8.  The ultimate decision was based on the fact that even if employees were aware of the agreement, they might not have been fully aware that they were forfeiting their rights to participate in the lawsuit.  Here, where there was no mention of the lawsuit, the same problem exists and is only exacerbated by the fact that the lawsuit was not mentioned.

[3] The imposition of the agreement combined with Nordstrom's failure to disclose the existence of the litigation is sufficient for the court to find an improper communication.  However, the court also notes that the existing confusion was likely buttressed by the circumstances surrounding imposition of the new agreement.  Many, and perhaps most of the putative class members were likely unaware of the pending litigation, and therefore may well have not fully appreciated the rights they were purportedly forfeiting by "accepting" the agreement through continuing their employment at Nordstrom.  Employees were asked to sign the acknowledgment of receipt, but were allegedly told by Nordstrom human resources personnel that the acknowledgment was not an agreement (even though the title of the document was "Nordstrom Dispute Resolution Agreement").  According to Nordstrom, only the DRA itself was actually an

1       In sum, because Nordstrom's communication constituted an improper attempt to alter the
2 pre-existing arbitration agreement with putative class members during litigation, this court
3 invalidates the "rolled out" 2011 agreement as to putative class members under the reasoning of
4 In re Currency Conversion. The motion to compel arbitration is DENIED.

5 **B. Motion to Consolidate Cases**

6       Because the court has denied the motion to compel arbitration, it must decide whether the
7 Balasanyan and Mareventano cases should be consolidated. Fed. R. Civ. P. 42(a) allows
8 consolidation of cases that involve a common question of law or fact. In considering a motion to
9 consolidate, the court has broad discretion and should "weigh[] the saving of time and effort
10 consolidation would produce against any inconvenience, delay, or expense that it would cause."
11 Huene v. U.S., 743 F.2d 703, 704 (9th Cir. 1984).

12       Here, consolidation will likely save time and effort given the similarity of the purported
13 classes, claims, and time periods at issue. Though there are some differences with respect to all
14 three of these, discovery will likely overlap to a large degree, and requiring the cases to maintain
15 their separate character would cause unnecessary repetition and inefficiency. While there is
16 some authority indicating that district courts may require the filing of a single complaint in cases
17 that are consolidated, the court declines to require this. From this point forward, the cases are
18 consolidated, but "each suit [shall] retain its separate character." Schnabel v. Lui, 302 F.3d
19 1023, 1035-36 (9th Cir. 2002) (discussing various instances in which consolidation does not
20 "merge suits into a single cause of action").

21 **III. CONCLUSION**

22       As explained above, Nordstrom's attempt to impose an arbitration agreement upon
23 putative class members during the pendency of litigation cannot be allowed. While the court

---

25 agreement. Yet it invited confusion to require a signature on a document that is not an agreement (but is entitled "Agreement") while simultaneously presenting a separate "agreement" that needed no affirmative approval by the employee.

does not rule on the viability of the agreement itself under other circumstances, the motion to compel arbitration is DENIED because of the improper communication with the class.  The motion to consolidate cases is GRANTED.

All subsequent filings in this case shall be filed under the new master case number, 10-cv-2671.  However, because each case retains its independent character, the caption of each subsequent filing shall clarify whether the filing relates to the original case number 10-cv-2671 or 11-cv-2609.

**IT IS SO ORDERED.**

DATED: March 8, 2012

Jeffrey T. Miller
United States District Judge